# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
## NASHVILLE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ex. rel. [UNDER SEAL], and | ) ) ) |
| STATE OF TENNESSEE, ex. rel. [UNDER SEAL], | ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) No. _____ ) |
| [UNDER SEAL], | ) JURY DEMAND ) |
| Defendants. | ) |

---

## FILED UNDER SEAL

---

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
## NASHVILLE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ex. rel. **DEBRA NORRIS**, and<br><br>STATE OF TENNESSEE, ex. rel. **DEBRA NORRIS**,<br><br>      Plaintiffs,<br><br>v.<br><br>MATTHEW ANDERSON; DAVID G. FLORENCE, D.O.; COUNCILL C. RUDOLPH, M.D.; CLARY P. FOOTE, M.D.; YOGESHWAR S. GILL, M.D.; JEAN N. MCGUIRE III, M.D.; CINDY SCOTT; CHARLOTTE MARKS; JERRY SHEPHERD; ELIZABETH COX; TERRY SOUTH; MELANIE MILLER; HOPE CRAFT; CANDICE TREXLER; JEFF FIELDS; MARY J. HARLAN; PATRICIA ELLIOT; DEANNA BRITTON; LISA GRESSEL; REBECCA NORFLEET; SHANNON BRANDFASS; OLA MERLE HENSON; COOKEVILLE PAIN CONSULTANTS OF PUTNAM COUNTY, P.C.; COOKEVILLE CENTER FOR PAIN MANAGEMENT, P.C.; PAIN SPECIALIST OF TENNESSEE, INC.; PREFERRED PAIN CENTER OF GRUNDY COUNTY, P.C.; SPINE AND MEDICAL ASSOCIATES OF GRUNDY COUNTY, P.C.; SPINE AND MEDICAL ASSOCIATES OF ROANE COUNTY, P.C.; SPINAL PAIN SOLUTIONS, P.C.; CENTER FOR ADVANCED MEDICINE; MID-TOWN MEDICAL CLINIC, LLC; MCMINNVILLE PAIN RELIEF CENTER, P.C.; QUIKCARE; PREMIERTOX 2.0, INC.; KEVIN ROBSON; JOHN DOE PREMIERTOX 2.0, INC. EMPLOYEES;<br><br>      Defendants. | No. _____<br><br>**JURY DEMAND** |

## SEALED QUI TAM COMPLAINT

Relator, Debra Norris, brings this action on behalf of herself and in the names of the United States of America and the State of Tennessee, by and through her undersigned attorneys, and alleges as follows:

## I.  INTRODUCTION

1.  Relator, Debra Norris ("Relator" or "Ms. Norris"), a resident of Putnam County, Tennessee, on behalf of herself and the United States of America ("United States") brings this action to recover treble damages, civil penalties, and costs under the False Claims Act, 31 U.S.C. § 3729 *et seq.*, and to recover damages and other monetary relief under the common law and equitable theories of unjust enrichment and payment by mistake of fact.

2.  Relator, on behalf of herself and the State of Tennessee ("Tennessee"), also brings this action to recover treble damages, civil penalties, and costs under the Tennessee Medicaid False Claims Act, Tenn. Code Ann. § 71-5-181 *et seq.*, and to recover damages and other monetary relief under the common law and equitable theories of unjust enrichment and payment by mistake of fact.

3.  This action arises from Defendants' conspiracy to defraud Medicare and TennCare, profiting off the treatment and prescription of narcotic medications to drug dealers, drug abusers, and other persons who had no medical necessity for these treatments and prescriptions.  The action further encompasses the false claims, statements, and documents Defendants knowingly presented, or caused to be presented to, the United States and the State of Tennessee, in violation of the United States False Claims Act ("FCA"), the Tennessee Medicaid False Claims Acts ("TMFCA"), and common law.

2

4.     Defendants operate a number of "pill-mills" masquerading as pain clinics in the State of Tennessee, and have conspired to perpetrate a long-running scheme to provide narcotics to persons lacking the medical necessity for such prescriptions, while profiting both from the sham examinations of these "patients" as well as the associated procedures and office visits, all actions which have intentionally defrauded the United States and the State of Tennessee and put the health and safety of the general public at risk. Such schemes include, but are not limited to the following:

a.   Conspiring to operate sham pain management clinics for the purposes of distributing narcotics and generating profits from the office visits associated with the narcotics prescriptions;

b.   Certifying to Medicare and TennCare the medical necessity of prescriptions for narcotics for persons who had no such medical necessity;

c.   Certifying the existence of sufficient medical documentation or evidence to support prior authorization of narcotics prescriptions under Medicare and TennCare, when no such documentation or evidence existed;

d.   Conspiring with persons who lacked medical necessity to help these persons gain and fill prescriptions for narcotic medications, which they subsequently resold, and conspiring with these persons to defraud Medicare and TennCare into paying for such prescriptions;

e.   Knowingly miscoding or upcoding procedures and/or claims when billing Medicare and/or TennCare by using a standard or boilerplate superbill, rather than a form individualized to each patient;

3

f.  Conspiring and participating in a kickback scheme with a laboratory testing company in the form of impermissible shared labor, leasing space from Defendants that the company allows Defendants to use rent free, and other practices in violation of state and federal law.

5.  When submitting claims to Medicare, Defendants used claim forms containing the following language (*see, e.g.,* Exhibit 1):

**SIGNATURE OF PHYSICIAN OR SUPPLIER (MEDICARE, CHAMPUS, FECA, AND BLACK LUNG)**

I certify that the services shown on this form were medically indicated and necessary for the health of the patient and were personally furnished by me or were furnished incident to my professional service by my employee under my immediate personal supervision, except as otherwise expressly permitted by Medicare or CHAMPUS regulations.

6.  When submitting claims to TennCare, Defendants used claim forms containing the following language (*see, e.g.,* Exhibit 1 at "Medicaid Payments (Provider Certification)"):

**SIGNATURE OF PHYSICIAN (OR SUPPLIER)**: I certify that the services listed above were medically indicated and necessary to the health of this patient and were personally furnished by me or my employee under my personal direction.

NOTICE: This is to certify that the foregoing information is true, accurate and complete.  I understand that payment and satisfaction of this claim will be from Federal and State funds, and that any false claims, statements, or documents, or concealment of a material fact, may be prosecuted under applicable Federal or State laws.

*See, e.g.,* T.C.A. § 71-5-191(a)(1) (directing the creation of a "uniform TennCare claims process"); Tenn. Comp. R. & Regs. 0780-01-73-.04 (adopting the use of the HCFA-1500/CMS-1500 form for TennCare claims).

7.  Defendants submitted claims variously to Medicare and TennCare with respect to their patients.  For claims submitted to Medicare, Defendants signed the certification in

4

paragraph 5, above, and presented it for payment to Medicare. For claims submitted to TennCare, Defendants signed the certification in paragraph 6, above, and presented it for payment to TennCare.

8.    In thousands of cases, Defendants knowingly falsely certified the medical necessity of the claims they were making on forms containing the certification in paragraph 5 submitted to Medicare, creating thousands of false claims made to Medicare. In thousands of cases, Defendants falsely certified that procedures corresponding with the current procedural terminology ("CPT") codes listed were performed on forms containing the certification in paragraph 5 submitted to Medicare, creating thousands of false claims made to Medicare.

9.    In thousands of cases, Defendants knowingly falsely certified the medical necessity of the claims they were making on forms containing the certification in paragraph 6 submitted to TennCare, creating thousands of false claims made to Medicare. In thousands of cases, Defendants falsely certified that procedures corresponding with the CPT codes listed were performed on forms containing the certification in paragraph 6 submitted to TennCare, creating thousands of false claims made to TennCare.

10.    In addition to the claims submitted for reimbursement, Defendants knowingly made false statements and/or submitted false records to Medicare and/or TennCare in support of pre-authorization for their patients' prescriptions. Defendants represented that medical diagnoses, testing, and documentation existed to support the prescriptions that were being written, when no such diagnoses, testing, and/or documentation existed.

11.    In support of these thousands of false certifications, claims, and statements made to Medicare and TennCare, a conspiracy to defraud Medicare and TennCare existed between and

among the Pain Clinic Defendants.[1]  The various owners, medical directors, nursing staff, and office staff of the Defendant Pain Clinics were knowing, as that term is defined in the FCA and the TMFCA, that such practices were false, fraudulent, and in violation of the law.  These Defendants knew, as defined in the FCA and TMFCA, that their practices were defrauding Medicare and/or TennCare of funds.

12.  The Pain Clinic Defendants also conspired with their patients to have these patients knowingly present false claims (i.e., claims for payment for the costs of medication) to Medicare and/or TennCare.  There exists a separate set of false claims for each patient with whom the Pain Clinic Defendants conspired because in each and every one of the thousands of times a patient presented a prescription from one of the Defendants to be filled, and the costs or part of the costs of those prescriptions were paid by Medicare or TennCare, such a claim was both "false" under the FCA and TMFCA and "presented" under the FCA and TMFCA.

13.  Finally, the Pain Clinic Defendants conspired with the PremierTox Defendants[2] to submit false or fraudulent claims to Medicare and/or TennCare, because the relationship between PremierTox and the Pain Clinic Defendants was tainted by violation of the Stark and Anti-Kickback statutes.  42 U.S.C. § 1395nn (Stark); 42 U.S.C. § 1320a-7b(b) (Anti-Kickback).  PremierTox leased space from the Pain Clinic Defendants, yet allowed the pain clinics to use the space rent-free; PremierTox also allowed the Pain Clinic Defendants to use PremierTox staff to perform pain clinic functions, again without payment.  Finally, PremierTox forewent collection of payment on some patients and continued to provide urine screens to these patients, which

---

[1] The "Pain Clinic Defendants" are all Defendants except for PremierTox 2.0, Inc.; Kevin Robson; and John Doe PremierTox 2.0 Inc. Employees.

[2] The "PremierTox Defendants" are Defendants PremierTox 2.0, Inc.; Kevin Robson; and John Doe PremierTox 2.0 Inc. Employees.

6

allowed these patients to continue receiving medications from the Pain Clinic Defendants and allowed these Defendants to continue to defraud Medicare and/or TennCare.

## II. JURISDICTION AND VENUE

14.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1345, and 1367 and 31 U.S.C. §§ 3730 and 3732. This court has jurisdiction over the Tennessee Medicaid False Claims Act claims pursuant to 31 U.S.C. § 3732(b) and Tenn. Code Ann. § 4-18-104(c)(2).

15.     This Court has personal jurisdiction over Defendants pursuant to 31 U.S.C. § 3732(a) because at least one Defendant resides and/or can be found in the Middle District of Tennessee, Defendants transacted and continue to transact business in the Middle District of Tennessee, and many of the acts proscribed by 31 U.S.C. § 3729 occurred in the Middle District of Tennessee.

16.     Venue is proper in this District pursuant to 31 U.S.C. § 3732(a) because at least one Defendant resides and/or can be found in the Middle District of Tennessee, Defendants transacted and continue to transact business in the Middle District of Tennessee, and many of the acts proscribed by 31 U.S.C. § 3729 occurred in the Middle District of Tennessee. Venue is also proper under 28 U.S.C. § 1391(b)(1) because at least one Defendant resides in the Middle District of Tennessee, and all Defendants are residents of the State of Tennessee; venue is proper under 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to these claims occurred in the Middle District of Tennessee.

## III. PARTIES

17.     Plaintiffs in this action are Relator Debra Norris, the United States, and the State of Tennessee.

7

18.     Relator Debra Norris brings this action pursuant to the qui tam provisions of the False Claims Act, 31 U.S.C. § 3730(b)(1) and the Tennessee Medicaid False Claims Act, Tenn. Code Ann. § 71-5-183(b)(1).

19.     Relator has served a copy of this Complaint, together with a written disclosure statement setting forth and enclosing all material evidence and information she possesses, upon the United States consistent with 31 U.S.C. § 3730(b) and Fed. R. Civ. P. 4(i) and upon the State of Tennessee consistent with Tenn. Code Ann. § 71-5-183(b).

20.     Relator has complied with all other conditions precedent to bringing this action.

21.     Relator is the original source of, and has direct and independent knowledge of, all publicly disclosed information on which any allegation herein might be deemed based, and has voluntarily provided such information to the United States and the State of Tennessee.

22.     Relator was employed by Defendant Matthew Anderson as an office manager in one of the several pain clinics owned by, controlled by, or otherwise connected with Defendants. Through her employment with Defendant Anderson and through working personally with many of the other Defendants, Relator has personal knowledge of the false records, statements, certifications, and claims that Defendants presented or caused to be presented to the United States and to the State of Tennessee.

23.     Defendant Matthew Anderson is a Tennessee resident.  He is a chiropractor and the shadow owner of a number of Defendant pain clinics.  Anderson makes or made the lease payments for Cookeville Pain Consultants of Putnam County, P.C. and Spine and Medical Associates of Roane County, P.C., as well as paying for utilities and other overhead costs for these and other Defendant pain clinics.   Anderson also made decisions regarding the

8

management and practices of these and other Defendant pain clinics. Anderson reaped profits from the Medicare and TennCare fraud perpetrated at the Defendant pain clinics.

24.     Defendant David G. Florence, D.O., is a Tennessee resident and the owner of Spine and Medical Associates of Grundy County, P.C.; Spine and Medical Associates of Roane County, P.C.; and Center for Advanced Medicine. He is the former owner of Cookeville Pain Consultants of Putnam County, P.C. Florence is the former Medical Director of Spine and Medical Associates of Grundy County, P.C. and Mid-Town Medical Clinic, LLC and is the current Medical Director of Center for Advanced Medicine.

25.     Defendant Cindy Scott is a Tennessee resident and nurse practitioner who works closely with Anderson and Florence at Cookeville Pain Consultants of Putnam County, P.C. Previously, Scott worked with Anderson, Florence, and Defendant Clary Foote, M.D. at Spine and Medical Associates of Roane County, P.C. and Preferred Pain Center of Grundy County, P.C.

26.     Defendant Charlotte Marks is a Tennessee resident who works closely with Defendant Anderson, and is his key employee with regards to credentialing and medical records. Marks sets up and maintains the electronic medical records systems for all of Anderson's pain clinics, and directs the staff at the clinics with regards to medical records. Marks worked at Spine and Medical Associates of Roane County, P.C., Preferred Pain Center of Grundy County, P.C., and currently works at McMinnville Pain Relief Center, P.C. In her capacity, Marks works closely with Defendants Anderson, Florence, Scott, and others. She has visited other pain clinics in the course of her work, including Cookeville Pain Consultants of Putnam County, P.C.

27.     Defendant Jerry Shepherd is a Tennessee resident who works closely with Defendant Anderson, and is his mentor in the practice of setting up a string of healthcare clinics

9

for later sale as a package. Shepherd previously owned and sold a set of respiratory therapy and physical therapy clinics. Shepherd was licensed as a respiratory therapist during the time in which he owned these clinics. He assists Defendant Anderson in his fraud scheme, and also performs procedures at many of the Defendant Pain Clinics, including Cookeville Pain Consultants of Putnam County, P.C. Shepherd has worked closely with Defendants Anderson, Florence, Scott, and others.

28. Defendant Terry South is a Tennessee resident and nurse practitioner who works with Defendants Anderson and Florence at Spine and Medical Associates of Roane County, P.C., as well as with these Defendants at Cookeville Pain Consultants of Putnam County, P.C. South also worked at Preferred Pain Center of Grundy County, P.C.

29. Defendant Melanie Miller is a Tennessee resident medical assistant who works with Defendants Anderson, Florence, Scott, and Rudolph at Cookeville Pain Consultants of Putnam County, P.C. In particular, Miller handled preauthorizations through TennCare, training and directing others to make false statements and submit false records. Miller also worked with Defendant Scott at Preferred Pain Center of Grundy County, P.C. Currently, Miller is the office manager at Cookeville Pain Consultants of Putnam County, P.C. or its successor.

30. Defendant Candy Trexler is a Florida resident who worked extensively with the Pain Clinic Defendants to file false and/or fraudulent Medicare and/or TennCare claims.

31. Defendant Clary Foote, M.D. is a resident of Tennessee who served as medical director for Spine and Medical Associates of Roane County, P.C.; Cookeville Pain Consultants of Putnam County, P.C.; and Pain Specialist of Tennessee, Inc.

32. Defendant Councill C. Rudolph, M.D. is a resident of Tennessee who is the owner and medical director of Cookeville Pain Consultants of Putnam County, P.C.; worked at Spine

and Medical Associates of Grundy County, P.C.; is the owner and medical director of McMinnville Pain Relief Center, P.C.; is the owner and medical director of Quikcare; and is the owner and medical director of Preferred Pain Center of Grundy County, P.C.

33. Defendant Yogeshwar ("Garry") Gill, M.D. is a resident of Tennessee who is the medical director of Spine and Medical Associates of Grundy County, P.C.; is the medical director of Mid-Town Medical Clinic, LLC; and worked at Spine and Medical Associates of Roane County, P.C.

34. Defendant Jean N. McGuire, III, M.D. is a resident of Tennessee who worked at Spine and Medical Associates of Roane County, P.C.

35. Defendant Elizabeth Cox is a resident of Tennessee who is the nurse practitioner at Spine and Medical Associates of Roane County, P.C.

36. Defendant Hope M. Craft is a resident of Georgia who is the nurse practitioner at Preferred Pain Center of Grundy County, P.C.

37. Defendant Jeff Fields is a resident of Tennessee who is the owner of Pain Specialist of Tennessee, Inc.

38. Defendant Mary J. Harlan is a resident of Tennessee who is a nurse practitioner at Pain Specialist of Tennessee, Inc.

39. Defendant Patricia Elliot is a resident of Tennessee who is a nurse practitioner at the Center for Advanced Medicine.

40. Defendant Deanna Britton is a resident of Tennessee who is a nurse practitioner at the Center for Advanced Medicine.

41. Defendant Lisa Gressel is a resident of Tennessee who is a physician's assistant at the Center for Advanced Medicine.

11

42. Defendant Rebecca Norfleet is a resident of Tennessee who is the owner of, and nurse practitioner at, Mid-Town Medical Clinic, LLC.

43. Defendant Shannon Brandfass is a resident of Tennessee who is a physician's assistant at McMinnville Pain Relief Center, P.C. and Preferred Pain Center of Grundy County, P.C.

44. Defendant Ola Merle Henson is a resident of Tennessee who is the nurse practitioner at Quikcare.

45. Defendant Cookeville Pain Consultants of Putnam County, P.C. is a Tennessee corporation with its principal place of business at 580 South Jefferson St. Suite 5, Cookeville, TN 38501.

46. Defendant Cookeville Center for Pain Management, P.C. is a Tennessee corporation with its principal place of business at 580 South Jefferson St. Suite 5, Cookeville, TN 38501, and is the successor to Defendant Cookeville Pain Consultants of Putnam County, P.C., with the same staff and patients.

47. Defendant Pain Specialist of Tennessee, Inc. is a Tennessee corporation with its principal place of business at 1559 Highland Park Drive, Lenoir City, TN 37772.

48. Defendant Spine and Medical Associates of Grundy County, P.C. is a Tennessee corporation with its principal place of business at 32717 SR 108, Gruetli-Laager, TN 37339.

49. Defendant Preferred Pain Center of Grundy County, P.C. is a Tennessee corporation with its principal place of business at 32717 SR 108, Gruetli-Laager, TN 37339, and is the successor to Defendant Spine and Medical Associates of Grundy County, P.C., with the same staff and patients.

12

50.    Defendant Spine and Medical Associates of Roane County, P.C. is a Tennessee corporation with its principal place of business at 1208 South Roane St., Harriman, TN 37748.

51.    Defendant Spinal Pain Solutions, P.C. is a Tennessee corporation with its principal place of business at 1208 South Roane St., Harriman, TN 37748, and is the successor to Defendant Spine and Medical Associates of Roane County, P.C. with the same staff and patients.

52.    Defendant Center for Advanced Medicine is a Tennessee corporation with its principal place of business at 804 Keylon St., Manchester, TN 37355.

53.    Defendant Mid-Town Medical Clinic, LLC is a Tennessee corporation with its principal place of business at 1815 Hillsboro Blvd., Manchester, TN 37355.

54.    Defendant McMinnville Pain Relief Center, P.C. is a Tennessee corporation with its principal place of business at 810 Sparta St. Suite 4, McMinnville, TN 37110.

55.    Defendant Quikcare is a Tennessee company with its principal place of business at 15 Veterans Dr., Decherd, TN 37324.

56.    Defendant PremierTox 2.0, Inc. ("PremierTox") is a Kentucky Corporation with its principal office at 1150 Danville Rd., Harrodsburg, Kentucky 40330.  PremierTox may be reached by service of process through its Registered Agent, Michael Hinchion, at 401 Commerce St., Suite 800, Nashville, Tennessee 37219.

57.    Defendant Kevin Robson is a Tennessee resident and is the Area Business Director for Defendant PremierTox working with the individual Defendants and Defendant Pain Clinics.

58.    Defendants John Doe PremierTox Employees are residents of Tennessee and are employees of Defendant PremierTox who work or otherwise collaborate with Defendants in their schemes to defraud Medicare and TennCare.

13

## IV.  FEDERAL STATUTORY BACKGROUND

### A.  The United States False Claims Act

59.    The United States False Claims Act ("FCA"), at 31 U.S.C. § 3729 contains several sections giving rise to liability.  Section 3729(a)(1)(A) creates liability for anyone who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval" to the Government ("Presentment False Claims"); Section 3729(a)(1)(B) creates liability for anyone who "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim" ("Records and Statements False Claims"); and Section 3729(a)(1)(C) creates liability for anyone who "conspires to commit a violation of subparagraph (A), (B), (D), (E), (F), or (G)" ("Conspiracy False Claims").

60.    The Fraud Enforcement and Recovery Act of 2009 ("FERA") amended the FCA, substantially increasing the range of behavior giving rise to False Claims Act cases, and lightening the burden on the Government.

61.    Before FERA's amendments, the FCA provided, at 31 U.S.C. § 3729(a)(1) (now (a)(1)(A)), that liability attaches when a defendant "knowingly presents, or causes to be presented, to an officer or employee of the United States Government or a member of the Armed Forces of the United States a false or fraudulent claim for payment or approval."  FERA amended this section by removing the phrase "to an officer or employee of the United States Government or a member of the Armed Forces of the United States."

62.    Before FERA's amendments, the FCA provided, at 31 U.S.C. § 3729(a)(2) (now (a)(1)(B)), that liability attaches when a defendant "knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government."  FERA amended this section by removing the phrase "to get a false or fraudulent

14

claim paid or approved by the Government" and substituted "material to a false or fraudulent claim."

63. Before FERA's amendments, the FCA provided, at 31 U.S.C. § 3729(a)(3) (now (a)(1)(C)), that liability attaches when a defendant "conspires to defraud the Government by getting a false or fraudulent claim allowed or paid." FERA amended this section by removing this phrase and substituting "conspires to commit a violation of subparagraph (A), (B), (D), (E), (F), or (G)."

64. Congress determined that the amendment to 31 U.S.C. § 3729(a)(2) (Records False Claims) should "take effect as if enacted on June 7, 2008" and should "apply to all claims under the False Claims Act. . . that are pending on or after that date." P.L. 111-21, Sec. 4(f)(1).

65. The FCA defines the term "claim" to mean

> any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property, that -- (i) is presented to an officer, employee, or agent of the United States; or (ii) is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States Government -- (I) provides or has provided any portion of the money or property requested or demanded; or (II) will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded . . . .

31 U.S.C. § 3729(b)(2)(A).

66. The FCA defines the terms "knowing" and "knowingly" to mean that a person, with respect to information: (1) "has actual knowledge of the information"; (2) "acts in deliberate ignorance of the truth or falsity of the information"; or (3) "acts in reckless disregard of the truth or falsity of the information." 31 U.S.C. § 3729(b)(1)(A). The FCA further provides that "no proof of specific intent to defraud" is required. 31 U.S.C. § 3729(b)(1)(B).

15

## B. The Tennessee Medicaid False Claims Act

67.     Tennessee's Medicaid False Claims Act (the "TMFCA") is substantially similar to the FCA but covers claims made to TennCare. *See* T.C.A. § 71-5-181 *et seq.*

68.     Under T.C.A. § 71-5-183(b)(1), a relator may bring a civil action under the TMFCA in the name of the state of Tennessee against any person who may be liable for violations of the TMFCA.  Though "person" is not defined by the TMFCA, the Tennessee False Claims Act defines "person" as including "any natural person, corporation, firm, association, organization, partnership, limited liability company, business, or trust."  T.C.A. § 4-18-102(3).

69.     The TMFCA provides that a person is liable to the State of Tennessee for each instance in which the person

> (1) Knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval under the medicaid program; (2) Knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim to get a false or fraudulent claim under the medicaid program paid for or approved; [or] (3) Conspires to commit a violation of subdivision (a)(1)(A), (a)(1)((B), or (a)(1)((D) . . . .

T.C.A. § 71-5-182(a)(1).  These three types of false claims are the same as the federal types described above; i.e., they are "presentment false claims," "records and statements false claims," and "conspiracy false claims."

70.     For each violation, the Tennessee TMFCA provides that the person is liable "for a civil penalty of not less than five thousand dollars ($5,000) and not more than twenty-five thousand dollars ($25,000) . . . , plus three (3) times the amount of damages which the state sustains because of the act of that person."  *Id.*

71.     The TMFCA defines the terms "knowing" and "knowingly" to mean

> that a person, with respect to information, (A) Has actual knowledge of the information; (B) Acts in deliberate ignorance of

16

the truth or falsity of the information; or (C) Acts in reckless disregard of the truth or falsity of the information, and no proof of specific intent to defraud is required.

T.C.A. § 71-5-182(b).

72.     Under the TMFCA, "Claim" means

any request or demand, whether under a contract or otherwise, for money or property and whether or not the state has title to the money or property, that is presented to any employee, officer, or agent of the state, or is made to any contractor, grantee, or other recipient, if the money or property is to be spent or used on the state's behalf or to advance a state program or interest, and if the state provides or has provided any portion of the money or property requested or demanded; or if the state will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded; and does not include requests or demands for money or property that the state has paid to an individual as compensation for state employment or as an income subsidy with no restrictions on that individual's use of the money or property.

T.C.A. § 71-5-182(c).

## V. FACTS

### A. Pain Management Clinics

73.     Pain management clinics ("pain clinics") are defined under Tennessee law as a

privately-owned facility in which a majority of the facility's patients, seen by any or all of its medical doctors, osteopathic physicians, advanced practice nurses with certificates of fitness to prescribe, or physician assistants, are provided pain management services by being prescribed or dispensed, opioids, benzodiazepines, barbiturates, or carisoprodol, but not suboxone, for more than ninety (90) days in a twelve-month period.

T.C.A. § 63-1-301.

74.     Pain clinics are tightly regulated, because they are specifically empowered to provide long-term prescriptions for narcotics (i.e., Schedule II and Schedule III medications under the Controlled Substances Act, 21 U.S.C. § 812 *et seq.*), and their services are at risk of

17

being abused by drug addicts and drug dealers. Providers writing prescriptions for these controlled substances must register with the Drug Enforcement Agency ("DEA"). *See* 21 C.F.R. § 1301.11; Tenn. Comp. R. & Regs. 1200-34-01-.03, .07.

75. Under Tennessee regulations, each pain management clinic must have a physician "medical director" whose medical license is unrestricted and unencumbered, and this medical director must be on-site for at least twenty percent (20%) of the clinic's weekly total number of operating hours. *See* T.C.A. §§ 63-1-306, 309; Tenn. Comp. R. & Regs. 1200-34-01-.07(a).

76. Pain clinics bill Medicare and/or TennCare for office visits. These office visits serve as the basis for patients' narcotics prescriptions, the cost of which are also submitted to Medicare and TennCare by these patients.

## B.  The Basic Fraud Scheme

77. Defendant Matt Anderson is a chiropractor. Under Tennessee law, he cannot act as the medical director of a pain management clinic. *See* T.C.A. § 63-1-306. Instead, Anderson has recruited a variety of the Defendants, including David Florence, D.O.; Councill Rudolph, M.D.; Clary Foote, M.D.; Yogeshwar ("Garry") Gill, M.D.; and Jean McGuire, III, M.D. to set up multiple pain management clinics on his behalf that function as pill mills. Dr. Gill, in particular, was relied heavily upon by Anderson as an authority on how to make sure claims were accepted by Medicare. These doctors also independently set up their own pain management clinics, in collaboration with each other and with Anderson, to serve the same ends.

78. As shadow owner, Anderson recruited the Defendant doctors (Defendants Florence, Rudolph, Foote, Gill, and McGuire (the "Defendant Doctors")) to serve as figurehead medical directors, while the actual office visits and prescriptions were handled by lower-level office staff such as Defendants Scott, Craft, Cox, Brandfass, and South. As inducement to act as

figurehead medical directors, Anderson offered these doctors 5% of the profits made by the clinic, including profits earned by defrauding Medicare and/or TennCare, as more fully described below.

79.    These doctors serve variously as treating physicians and medical directors of a number of pain management clinics in the Middle and East Tennessee area.  These clinics intermingle staff and form the fraudulent conspiratorial network that is the subject of this Complaint.

80.    Defendant Doctor Florence considers himself to have a charming and TV-friendly personality.  He financed the production of a trailer and set of videos for a reality-television show centered around himself and his medical practice.  The name of the proposed show was "DocStar," and it was to star Dr. Florence as well as his "eight willing nurses."  Florence's "trailer" for the show, as well as several "teasers" are <u>available for viewing on the web</u>.[3]

81.    The Defendant Doctors spend no substantial time at the pain management clinics of which they are the medical directors, and do not meet the Tennessee requirement that they be physically present for 20% of the hours during which the pain clinics at which they are listed as medical director are seeing patients.  Knowing this, they nonetheless submit claims for payment to Medicare and TennCare, impliedly certifying that they are complying with this requirement.  Instead, patients of these clinics file through a high-volume setting in an assembly-line fashion, with "appointments" lasting no more than a minute or two, and leave with a set of narcotics prescriptions selected from the standard "menu" offered by the clinic.

82.    Defendants are aware of the 20% requirement but knowingly circumvent it.  While at Cookeville Pain Consultants of Putnam County, P.C., Defendant Scott explained to

---

[3] The main website for Florence's "DocStar" concept is <u>http://www.docstartn.tv/index.php</u>, and his videos (uploaded to YouTube), are available at <u>http://www.youtube.com/user/docstartv?feature=watch</u>.

19

Relator (and others), that they should never expect to see a doctor on-site. Scott further explained that this was the typical practice, and that when she was working at Spine and Medical Associates of Grundy County, P.C., in Gruetli-Laager, TN, she "never saw a doctor" there. In response to questions about the 20% requirement, from Relator and others, Defendant Marks informed the staff that because doctors could view and sign medical records electronically (a system Marks set up), they were not required to come into the pain clinic personally. Defendants Scott, Marks, Anderson and the Defendant Doctors pursued this practice, and continue to do so, knowing that it is fraudulent and in violation of the law.

83.     There are several steps involved in getting a narcotic prescription for a patient of one of the Defendant pain clinics. The first step is an office visit. The Defendant Pain Clinics generally submit claims for payment to Medicare and Tenncare for these office visits. Once an office visit has been completed and a fraudulent diagnosis and prescription are given, the pain clinic applies for preauthorization through Medicare or TennCare, to show that the patient has a medical need for the narcotics that are being prescribed. Once pre-authorized, the patient takes the prescription to a pharmacy to fill, and Medicare or TennCare is generally charged for filling the prescription.

84.     Some of the Defendant Pain Clinics did not or do not accept TennCare. These clinics accept cash for payment for doctor's visits from their patients. However, these clinics still perform preauthorizations for these TennCare patients, and thus both conspire with these patients to submit false claims, as well as make false statements and submit false records material to those patients' false claims.

85.     The Pain Clinic Defendants serve hundreds, and perhaps thousands, of sham "patients," whom the Defendants know lack the medical necessity for prescription narcotics.

20

The Defendants encourage these patients to make appointments, as well as bring members of their family for their own separate appointments. It is not uncommon for 5-10 members of the same family to present at one of the Defendant Pain Clinics to receive narcotics prescriptions. Defendants are aware, in many instances, that large numbers of "patients" have been recruited by drug dealers for the purpose of amassing legitimate prescriptions and narcotics to be resold. Patients are scheduled for an initial visit, and then follow-up visits, in order to renew the narcotics prescriptions. Schedule II narcotics prescriptions are non-refillable under the Controlled Substances Act. 21 U.S.C.A. § 829 ("No prescription for a controlled substance in schedule II may be refilled."). In this way, Defendants can charge Medicare and TennCare for regular office visits for patients, to maximize reimbursement.

86. The Defendant pain clinics submit claims to Medicare and TennCare (depending on which program the patient is a participant of) to receive reimbursement for these office visits. However, the Pain Clinics do not individualize the reimbursement forms for each patient. Instead, the clinic uses the same boilerplate "superbill," containing the same CPT codes, for many or most of its patients, regardless of whether these patients have differing diagnoses, different areas of pain, or different therapies (or, in many cases, any symptoms at all). These standard CPT codes are submitted to Medicare or TennCare using the CMS-1500 form, including the certifications included in paragraphs 5 and 6, above.

87. Nurses, nurse practitioners, and office staff at the pain clinics are instructed by Defendant Anderson, as well as the Defendant Doctors, to pre-write prescriptions for many patients, because the majority of patients are given the same types and dosages of medications from a standard "menu" used by the Defendant Pain Clinics. In most instances, there is no

21

individualized care, no individualized diagnosis, and no consideration of medical necessity or appropriateness.

88.     Nurses and nurse practitioners at the pain clinics handle the patient visits, which last no more than a few minutes, with office notes pre-written in most instances. In this way, the Defendant clinics can process as many "patients" as possible during a single day, and maximize the Medicare and TennCare reimbursement for office visits, as well as the amounts of narcotics available to their "patients," with whom they conspire. During the rare day in which one of the Defendant Doctors is actually present at one of the pain clinics, it is not uncommon for that doctor to see 60-70 patients in a single day. In some cases, Defendant Florence was able to "examine" up to 120 patients in a single day.

89.     The figurehead Medical Directors play virtually no role in the operation of the pain clinics, or in patient care. It is not uncommon for a pain clinic to go weeks or months without a visit from its medical director, in violation of statutes and regulations, which require a medical director to be physically on-site at a pain clinic for 20% of the hours the pain clinic is seeing patients during a given week.

90.     For example, on August 1st, 2012, before Cookeville Pain Consultants of Putnam County, P.C. had even received an operating license, Defendant Florence arrived to see patients for the day. His arrival had been pre-planned. Defendant Cindy Scott's mother had passed away and thus, she could not be there that day to see patients. In preparation for her absence, Defendant Melanie Miller (and others) pre-wrote dozens of prescriptions and hundreds of office notes. Florence arrived at the clinic (for the first time, though he had been listed as the medical director since May 7th, 2012) at approximately 11:00 a.m. From this time until approximately 4:30 p.m., Florence saw 72 patients, dispensing narcotics prescriptions for each one. Assuming

22

Florence worked straight through, and did not stop for lunch, this equates to an average of a little over 4.5 minutes per patient. As Relator can attest, however, Dr. Florence did stop for lunch; he also stopped several times to chat with the nurses and other staff, asking for amusing or outrageous anecdotes that he could use for his reality television show and sharing some of his more memorable exploits. With these substantial breaks, the time spent per patient drops to somewhere below 2-3 minutes each.

91.     During his August 1st visit to Cookeville Pain Consultants of Putnam County, P.C., Dr. Florence also took the opportunity to sign every single office note on patients of that clinic from May 7th until August 1st. This constituted over 1000 patient notes signed in a single sitting. Defendant Miller and others supported this practice, and assisted Dr. Florence in his blatantly fraudulent behavior.

92.     During these visits, the pain clinics apply for preauthorization through Medicare or TennCare for the prescriptions they write. The preauthorization process is designed to check for the existence of records and testing that support by documentation the diagnosis and any related prescriptions. Because the pain clinics' patients lack medical necessity, Defendants make false statements and/or submit false documentation to Medicare and/or TennCare to support preauthorization. As well, because preauthorization is specific and lasts for only a limited time, Defendants are able to "roll" a patient from one medication to another over time, with multiple false statements and/or documents for each preauthorization.

93.     Defendants refined their preauthorization fraud over time. Using an online form system (i.e., a "record" for FCA and TMFCA purposes), Defendants would submit preauthorizations in support of and material to their patients' false prescription claims. Defendants knew which medications were typically prescribed for which diagnoses, and were

careful to submit false diagnoses that would yield the prescription was what the patient wanted (i.e., a medication with high "street" value). In fact, Defendants also knew that certain diagnoses would yield preauthorizations for certain medications (from the formulary, as called for by TennCare and Medicare), which were not highly desired by their patients. To combat this, Defendants would add in other false statements, to the effect that such patients had a bad reaction or could not tolerate the formulary medication, and thus a different medication (usually, a more highly desired medication) would be substituted. Sometimes this false information would be submitted with the initial preauthorization; sometimes it would be submitted later, after TennCare or Medicare attempted to authorize a less desirable medication. This submissions process was planned and honed by Defendants, particularly Defendants Cindy Scott (who taught others) and Melanie Miller, and was used at all the Defendant Pain Clinics.

94.     Even when Defendants ordered some kind of medical testing, e.g. a CT scan or MRI as an attempt to pad the record in support of their false diagnoses, Defendants would certify that the results of such medical testing supported a particular diagnosis and prescription, regardless of whether the medical testing actually supported that diagnosis. Defendants Scott and Miller, in particular, utilized this method of preauthorization fraud, ordering medical testing as an attempt to provide some manner of support for his fraudulent diagnoses, but ignoring the results of the tests in most cases, and certifying pain diagnoses regardless.

95.     The statements made by the Pain Clinic Defendants to Medicare and TennCare in support of preauthorization (and the records submitted in support thereof), as well as to support payment for office visit claims, are part of a conspiracy between the Defendants and their patients to knowingly presenting false claims (i.e., claims for payment for the costs of medication) to Medicare and/or TennCare. Each time a sham patient presents a prescription

24

from one of the Defendants to be filled, and the costs or part of the costs of those prescriptions are paid by Medicare or TennCare, this is a separate false claim.

## C. The PremierTox Kickback Scheme

96. In addition to the fraud scheme described above, Defendant Anderson also established close ties with a laboratory testing company, PremierTox. PremierTox contracted with the Pain Clinic Defendants to perform urine drug screens on the Clinics' patients.

97. PremierTox leases space from Defendants in many of the Defendant Pain Clinics, yet allows the Pain Clinics to do business in that space, including office work, checking patient vitals, and other tasks. This arrangement violates federal Anti-Kickback law, 42 U.S.C. § 1320a-7b(b), because it represents PremierTox giving a thing of value to the Pain Clinic Defendants in exchange for referrals and as payment. Because of these violations, any claims submitted to Medicare by PremierTox violated the Stark Law, 42 U.S.C. § 1395nn, and the FCA.

98. PremierTox also allows PremierTox employees, i.e, the John Doe PremierTox Defendants, to be used by the Pain Clinic Defendants to take patient vitals, do office work, and run errands. In one case, an employee was fired for failing to comply with this illegal scheme. Defendant Anderson had an employee who worked for him at Spine and Medical Associates of Roane County, P.C. When PremierTox began its illegal relationship with Anderson, this employee was hired as a PremierTox employee, but told to continue performing Pain Clinic office functions. When she refused, citing her status as a PremierTox, rather than Pain Clinic, employee, she was fired by PremierTox. This arrangement also violates federal Anti-Kickback law. Because of these violations, any claims submitted to Medicare by PremierTox violated the Stark Law, 42 U.S.C. § 1395nn, and the FCA.

99.     PremierTox also foregoes collecting its fees from those the individual "patients" who lacked appropriate coverage under Medicare or TennCare, yet still provided testing services to these patients to allow Defendants to continue their illicit scheme. This supports both the ongoing fraud scheme of the Pain Clinics, because their patient volume (and payments for office visits), each patient must have a periodic urine screening, as well as the ongoing business of PremierTox. After all, PremierTox makes approximately $1,000 per screen it performs. In the interests of supporting the Pain Clinics in their fraud scheme, PremierTox, in effect, performs urine screens free for some of their patients. If the Pain Clinic Defendants cease to operate, PremierTox itself would also lose out financially.

## D.    The Fraudulent Network

100.    As described above, Defendants Anderson and Scott, as well as the Defendant Doctors and others, have had a close relationship over the years, and have built up a network of pain clinic pill mills. Defendant Pain Clinics named in the Complaint represent the known members of the pill mill network. The Pain Clinics show a remarkable amount of coordination and cross-ownership and control.

101.    Defendant Florence was the original owner of Cookeville Pain Consultants of Putnam County, P.C., where he also provided services and is connected to Defendants Matt Anderson, Cindy Scott, Councill Rudolph, and Clary Foote. Florence also worked with Cindy Scott at Spine and Medical Associates of Roane County, P.C., in Harriman, TN, which he owns. At this clinic, Florence is connected again to Defendant Clary Foote, but also Defendants Elizabeth Cox, Yogeshwar Gill, and Jean McGuire, III. Florence also owns the similarly-named Spine and Medical Associates of Grundy County, P.C., in Gruetli-Laager, TN, and was formerly listed as its medical director. At this clinic, he is again connected to Defendants Yogeshwar Gill

26

Councill Rudolph, and Cindy Scott, but also Defendant Hope Craft. Florence is <u>currently</u> the owner and medical director of the Center for Advanced Medicine in Manchester, TN, and was formerly listed as medical director of the Mid-Town Medical Clinic, also in Manchester, TN.

102. Defendant Councill Rudolph is connected to Defendant Florence through his ownership of Cookeville Pain Consultants of Putnam County in Cookeville, TN and his work at Spine and Medical Associates of Grundy County in Gruetli-Laager, TN (Florence is the owner). Rudolph is connected to Defendant Foote through his ownership of Cookeville Pain Consultants of Putnam County in Cookeville, TN. Rudolph is connected to Defendant Gill through his work at Spine and Medical Associates of Grundy County in Gruetli-Laager, TN (Gill is the medical director). Rudolph is connected to Defendant Scott through his ownership of Cookeville Pain Consultants of Putnam County in Cookeville, TN. Rudolph is connected to Defendant Brandfass through his ownership and medical directorship of Preferred Pain Center of Grundy County in Gruetli-Laager, TN and his ownership and medical directorship of McMinnville Pain Relief Center in McMinnville, TN.

103. Defendant Clary Foote is connected to Defendant Florence through his medical directorship of Cookeville Pain Consultants of Putnam County in Cookeville, TN and Spine and Medical Associates of Roane County in Harriman, TN. Foote is connected to Defendant Rudolph as described above. Foote is connected to Defendants Gill and Cindy Scott through his medical directorship of Spine and Medical Associates of Roane County in Harriman, TN.

104. Defendant Yogeshwar Gill is connected to Defendant Florence through his medical directorship of Spine and Medical Associates of Grundy County in Gruetli-Laager, TN (Florence is the owner) and Spine and Medical Associates of Roane County in Harriamn, TN

(Florence is the owner), as well as through Mid-Town Medical Clinic in Manchester, TN. Gill is connected to Defendant Rudolph as described above.

105. A number of other Defendants, including Defendants Brandfass, Craft, Scott, and others have multiple contacts with each other, Defendant Anderson, and the Defendant Doctors. Each doctor, nurse practitioner, or nurse at one of the Defendant Pain Clinics is no more than a single link away from any other Defendant.

106. Many of the Defendant Pain Clinics are in the same city or area, despite the fact that most of the locations are in very small rural areas such as Harriman and Gruetli-Laager, TN.

107. Most of the Defendant Pain Clinics' applications were signed and/or submitted in very close proximity in time to each other, though they were ostensibly being founded and directed by different people. For example, Defendant Gill signed the application for Spine and Medical Associates of Grundy County, P.C. on February 27, 2012, while also on February 27, 2012, Defendant Foote signed for Spine and Medical Associates of Roane County, P.C. On December 28, 2011, Defendant Gill signed the application for Mid-Town Medical Clinic, LLC and Defendant Florence signed for Center for Advanced Medicine. Defendant Rudolph signed four separate applications over the course of two months, for Cookeville Pain Consultants of Putnam County, P.C., Preferred Pain Center of Grundy County, P.C., Quikcare, and McMinnville Pain Relief Center, P.C.

## VI. COUNTS

### COUNT I
### VIOLATIONS OF THE UNITED STATES FALSE CLAIMS ACT
31 U.S.C. § 3729(a)(1)(A)
"Presentment False Claims"

107. Relator, on behalf of herself and the United States, re-alleges and incorporates paragraphs 1 through 107 above, as if set forth herein verbatim.

28

109.     From at least 2011 to the present, Defendants knowingly presented or caused to be presented false or fraudulent claims to the United States for payment, in violation of the False Claims Act, 31 U.S.C. § 3829(a)(1)(A). Specifically, the Defendants knowingly submitted, or caused to be submitted, invoices and other requests and claims for payment to the United States Government containing:

a.  Claims for payment or approval of costs for visits, procedures, and prescriptions that were not medically necessary, while certifying to the United States that such claims were medically necessary; specifically, Defendants submitted false certifications, including but not limited to Center for Medicaid Services ("CMS") Form 1500 ("Health Insurance Claim Form") for payment or approval of costs, falsely certifying that the services for which payment was sought "were medically indicated and necessary to the health of the patient and were personally furnished by [the provider] or were furnished incident to [the provider's] professional service by [the provider's] employee under [the provider's] immediate personal supervision";

b.  Claims for payment or approval of costs using false CPT codes; specifically, Defendants submitted CMS-1500 forms falsely certifying to the United States that the CPT codes listed on the form represented visits, treatments, and/or procedures that were actually performed and diagnoses the patient actually had, when such visits, treatments and/or procedures were not performed and/or the patients did not actually have the corresponding diagnoses.

29

110.    These false or fraudulent claims for payment or approval made by Defendants were material to the Government's decision to pay Defendants, and make Defendants liable under the False Claims Act.

111.    By virtue of these false or fraudulent claims, the United States suffered damages in an amount to be determined at trial.

**COUNT II**
**VIOLATIONS OF THE FALSE CLAIMS ACT**
31 U.S.C. § 3729(a)(1)(B)
"Records and Statements False Claims"

112.    Relator, on behalf of herself and the United States, re-alleges and incorporates paragraphs 1 through 111 above, as if set forth herein verbatim.

113.    From at least 2011 to the present, Defendants knowingly made, used, and/or caused to be made or used, false records and statements material to false or fraudulent claims made to the United States Government, in violation of the False Claims Act, 31 U.S.C. § 3829(a)(1)(B). Specifically, Defendants knowingly (1) submitted, or caused to be submitted, certifications and other documents to support false or fraudulent diagnoses and (2) made, or caused to be made, statements to Medicare material to the false or fraudulent claims contained in this Complaint as follows:

    a.  Defendants submitted CMS-1500 forms falsely certifying to the United States that the visits, treatments, and/or procedures were medically necessary and that the visits, treatments, and/or procedures were done by a physician or under proper physician supervision;

    b.  Defendant submitted CMS-1500 forms falsely certifying to the United States that the CPT codes listed on the form represented visits, treatments, and/or procedures that were actually performed and diagnoses the patient actually

30

had, when such visits, treatments and/or procedures were not performed and/or the patients did not actually have the corresponding diagnoses;

c. Defendants made false statements regarding the existence of supporting documentation, medical diagnoses, and/or diagnostic testing and the medical necessity of certain prescriptions to the United States in support of preauthorization and/or coverage determinations under 42 C.F.R. § 423.566 for the prescriptions Defendants wrote for their patients;

d. Defendants caused to be made claims for payment or approval of costs for prescription medications by patients of Defendants, based on false or fraudulent diagnoses and documentation made on behalf of the patients by the Defendants.

114. These false records submitted, and false statements made, by Defendants, were material to the Government's decision to pay Defendants and any third parties, including, for example, Defendants' patients and pharmacists who submit claims in reliance upon the false statements and records submitted by Defendants and material to these third party claims. Thus, these false statements and records make Defendants liable under the False Claims Act.

115. By virtue of these false or fraudulent claims, the United States suffered damages in an amount to be determined at trial.

## COUNT III
## VIOLATIONS OF THE FALSE CLAIMS ACT
### 31 U.S.C. § 3729(a)(1)(C)
### "Conspiracy False Claims"

116. Relator, on behalf of herself and the United States, re-alleges and incorporates paragraphs 1 through 115 above, as if set forth herein verbatim.

31

117.    From at least 2011 to the present, Defendants conspired among themselves to present the false claims to the United States as described above (i.e., make the "Presentment False Claims" in violation of 31 U.S.C. § 3729(a)(1)(A)), and to make the false statements and submit the false documents to the United States as described above (i.e., make the "Records and Statements False Claims" in violation of 31 U.S.C. § 3729(a)(1)(B)).   Certain Defendants, including Defendants Anderson and Scott, as well as the Defendant Doctors, directed other Defendants and employees of the Defendant Pain Clinics to use false and fraudulent CPT codes, to provide false and fraudulent statements to Medicare, to ignore state and federal regulations governing pain clinics, and the continue supporting the provision of narcotic medications to patients who lacked the medical necessity for them, knowing, as defined by the False Claims Act, that such actions were false, fraudulent, and in violation of the law.

118.    From at least 2011 to the present, Defendants also conspired with their patients to get false claims paid by the United States; to wit: Defendants conspired with these patients, who lacked the medical necessity for the medications they were prescribed, with knowledge that these patients lacked such medical necessity and than many of these patients were reselling such medications.   This conspiracy resulted in the presentation of thousands of false claims to the United States in violation of 31 U.S.C. § 3729(a)(1)(A) in the form of requests by these patients to the United States for payment to cover the costs of the medications that were fraudulently prescribed for them.   This conspiracy also resulted in the presentation of other false claims by other third parties, e.g., pharmacists, who submitted false claims in reliance on the false information and records submitted by Defendants.

119.    Finally, from at least 2011 to the present, the Pain Clinic Defendants conspired with the PremierTox Defendants to get hundreds or thousands of claims paid by the United

32

States that were rendered false under the FCA by virtue of the PremierTox Defendants' violation of the Stark and Anti-Kickback laws. Under Section 6402 of the Patient Protection and Affordable Care Act, any claims submitted by PremierTox for laboratory testing of the Pain Clinic Defendants' patients were false claims under the FCA because PremierTox violated the Stark and Anti-Kickback laws. ("(f) HEALTH CARE FRAUD.— (1) KICKBACKS.—Section 1128B of the Social Security Act (42 U.S.C. 1320a–7b) is amended by adding at the end the following new subsection: '(g) In addition to the penalties provided for in this section or section 1128A, a claim that includes items or services resulting from a violation of this section constitutes a false or fraudulent claim for purposes of subchapter III of chapter 37 of title 31, United States Code.'"). These violations included PremierTox leasing space from the Pain Clinic Defendants, yet allowing the pain clinics to use the space rent-free and PremierTox allowing the Pain Clinic Defendants to use PremierTox staff to perform pain clinic functions, again without payment

120.    By these actions, Defendants conspired to commit violations of both 31 U.S.C. §§ 3729(a)(1)(A) and (a)(1)(B), all in violation of 31 U.S.C. § 3729(a)(1)(C), making Defendants liable under the False Claims Act.

121.    By virtue of this conspiracy, the United States suffered damages in an amount to be determined at trial.

**COUNT IV**
**VIOLATIONS OF THE TENNESSEE MEDICAID FALSE CLAIMS ACT**
T.C.A. § 71-5-182(a)(1)(A)
"Presentment False Claims"

122.    Relator, on behalf of herself and the State of Tennessee, re-alleges and incorporates paragraphs 1 through 121 above, as if set forth herein verbatim.

33

123.     From at least 2011 to the present, Defendants knowingly presented or caused to be presented false or fraudulent claims to the State of Tennessee for payment, in violation of the Tennessee Medicaid False Claims Act, T.C.A. § 71-5-182(a)(1)(A).  Specifically, the Defendants knowingly submitted, or caused to be submitted, invoices and other requests and claims for payment to the State of Tennessee program containing:

a. Claims for payment or approval of costs for visits, procedures, and prescriptions that were not medically necessary, while certifying to the State of Tennessee that such claims were medically necessary; specifically, Defendants submitted false certifications, including but not limited to Center for Medicaid Services ("CMS") Form 1500 ("Health Insurance Claim Form") for payment or approval of costs, falsely certifying that the services for which payment was sought "were medically indicated and necessary to the health of the patient and were personally furnished by [the provider] or [the provider's] employee under [the provider's] personal direction";

b. Claims for payment or approval of costs using false CPT codes; specifically, Defendants submitted CMS-1500 forms falsely certifying to the State of Tennessee that the CPT codes listed on the form represented visits, treatments, and/or procedures that were actually performed and diagnoses the patient actually had, when such visits, treatments and/or procedures were not performed and/or the patients did not actually have the corresponding diagnoses; and

c. Claims for payment or approval of costs impliedly certifying that the Defendants were complying with applicable Tennessee statutes, rules, and

regulations including Tenn. Comp. Rules & Regs. 1200-34-01-.07 requiring the Medical Director of a pain clinic to "oversee all of the pain management services at the clinic" and "be on-site at the clinic at least twenty percent (20%) of the clinic's weekly total number of operating hours," when the various Defendant medical directors were not complying with these regulations;

d. Claims for payment or approval of costs impliedly certifying that the Defendants were complying with applicable Tennessee statutes, rules, and regulations including Tenn. Comp. Rules & Regs. 1200-34-01-.07 requiring that "all health care providers employed by or working at the pain management clinic comply with applicable state and federal laws and rules relative to the prescribing of controlled substances in the pain management clinic," when the health care providers employed by or working at the Pain Clinics were not complying with these laws and rules including 12 C.F.R. 1306.05 and T.C.A. § 63-6-236, forbidding the pre-signing of prescriptions;

e. Claims for payment for approval of costs certifying that the Defendants were complying with applicable Tennessee statutes, rules, and regulations regarding preauthorization for the prescriptions Defendants wrote, including but not limited to Tenn. Comp. Rules & Regs. 1200-13-16-.04 pertaining to prior authorizations; and

f. Claims for payment or approval of costs certifying that the Defendants were complying with applicable Tennessee statutes, rules, and regulations including Tenn. Comp. Rules & Regs. 1200-34-01-.07 requiring a "random drug

35

screening as clinically indicated, but at a minimum, upon each new admission and once every six (6) months thereafter," when the Pain Clinic defendants were participating in an illegal kickback scheme involving the PremierTox defendants, thus tainting claims submitted by the Pain Clinic defendants, as well as ordering such drug screens them more often than at new admission and every six months thereafter knowing that such drug screenings were neither random nor medically indicated.

124.    These false or fraudulent claims for payment or approval made by Defendants were material to the State's decision to pay Defendants, and make Defendants liable under the Tennessee Medicaid False Claims Act, T.C.A. § 71-5-182(a)(1)(A).

125.    By virtue of these false or fraudulent claims, the State of Tennessee suffered damages in an amount to be determined at trial.

**COUNT V**
**VIOLATIONS OF THE TENNESSEE MEDICAID FALSE CLAIMS ACT**
T.C.A. § 71-5-182(a)(1)(B)
"Records and Statements False Claims"

126.    Relator, on behalf of herself and the State of Tennessee re-alleges and incorporates paragraphs 1 through 125 above, as if set forth herein verbatim.

127.    From at least 2011 to the present, Defendants knowingly made, used, and/or caused to be made or used, false records and statements material to false or fraudulent claims made to the State of Tennessee, in violation of the Tennessee Medicaid False Claims Act, T.C.A. § 71-5-182(a)(1)(B). Specifically, Defendants knowingly, as that term is defined in the TMFCA, (1) submitted, or caused to be submitted, certifications and other documents to support false or fraudulent diagnoses and (2) made, or caused to be made, statements to the State of Tennessee to get a false or fraudulent claim contained in this Complaint paid or approved:

36

a. Defendants knowingly submitted CMS-1500 forms falsely certifying to the State of Tennessee that the visits, treatments, and/or procedures were medically necessary and that the visits, treatments, and/or procedures were done by a physician or under proper physician supervision;

b. Defendant knowingly submitted CMS-1500 forms falsely certifying to the State of Tennessee that the CPT codes listed on the form represented visits, treatments, and/or procedures that were actually performed and diagnoses the patient actually had, when such visits, treatments and/or procedures were not performed and/or the patients did not actually have the corresponding diagnoses;

c. Defendants knowingly made false statements regarding the existence of supporting documentation, medical diagnoses, and/or diagnostic testing and the medical necessity of certain prescriptions to the State of Tennessee in support of prior authorization and/or coverage determinations for the prescriptions Defendants wrote for their patients;

d. Defendants knowingly made false or fraudulent statements and submitted false or fraudulent documentation to the State of Tennessee on behalf of the patients, which were material to false or fraudulent claims by Defendants' patients and which caused these false or fraudulent claims to get paid or approved by the State of Tennessee.

128.    These false records submitted, and false statements made, by Defendants, were material to the Government's decision to pay Defendants and any third parties, including, for example, Defendants' patients and pharmacists who submit claims in reliance upon the false

37

statements and records submitted by Defendants and material to these third party claims. Thus, these false statements and records make Defendants liable under the Tennessee Medicaid False Claims Act.

129. By virtue of these false or fraudulent claims, the State of Tennessee suffered damages in an amount to be determined at trial.

**COUNT VI**
**VIOLATIONS OF THE TENNESSEE MEDICAID FALSE CLAIMS ACT**
T.C.A. § 71-5-182(a)(1)(C)
"Conspiracy False Claims"

130. Relator, on behalf of herself and the State of Tennessee re-alleges and incorporates paragraphs 1 through 129 above, as if set forth herein verbatim.

131. From at least 2011 to the present, Defendants conspired among themselves to present the false claims to the United States as described above (i.e., make the "Presentment False Claims" in violation of T.C.A. § 71-5-182(a)(1)(A)), and to make the false statements and submit the false documents to the United States as described above (i.e., make the "Records and Statements False Claims" in violation of T.C.A. § 71-5-182(a)(1)(B)). Certain Defendants, including Defendants Anderson and Scott, as well as the Defendant Doctors, directed other Defendants and employees of the Defendant Pain Clinics to use false and fraudulent CPT codes, to provide false and fraudulent statements to Medicare, to ignore state and federal regulations governing pain clinics, and the continue supporting the provision of narcotic medications to patients who lacked the medical necessity for them, knowing, as defined by the False Claims Act, that such actions were false, fraudulent, and in violation of the law.

132. From at least 2011 to the present, Defendants also conspired with their patients to get false claims paid by the State of Tennessee; to wit: Defendants conspired with these patients, who lacked the medical necessity for the medications they were prescribed, with knowledge that

38

these patients lacked such medical necessity and than many of these patients were reselling such medications. This conspiracy resulted in the presentation of thousands of false claims to the State of Tennessee in violation of T.C.A. § 71-5-182(a)(1)(A) in the form of requests by these patients to the United States for payment to cover the costs of the medications that were fraudulently prescribed for them. This conspiracy also resulted in the presentation of other false claims by other third parties, e.g., pharmacists, who submitted false claims in reliance on the false information and records submitted by Defendants.

133.    By these actions, Defendants conspired to commit violations of both T.C.A. §§ 71-5-182(a)(1)(A) and (a)(1)(B), all in violation of T.C.A. § 71-5-182(a)(1)(C), making Defendants liable under the Tennessee Medicaid False Claims Act.

134.    By virtue of this conspiracy, the State of Tennessee suffered damages in an amount to be determined at trial.

**COUNT VII**
**PAYMENT BY MISTAKE OF FACT**

135.    Relator, on behalf of herself, the United States, and the State of Tennessee re-alleges and incorporates paragraphs 1 through 134 above, as if set forth herein verbatim.

136.    This is a claim for the recovery of monies paid by the United States and the State of Tennessee to Defendants by mistake.

137.    The claims made by Defendants to the United States and to the State of Tennessee were false, fraudulent, and otherwise unallowable, as described above, for lack of medical necessity, lack of preauthorization, failure of compliance with applicable federal and state statutes and regulations that were conditions of payment, and false or fraudulent CPT coding.

138.    The United States and the State of Tennessee, acting in reasonable reliance on the accuracy and truthfulness of the information contained in these claims, as well as supporting

39

documents and statements made by Defendants, as described above, paid to the Defendants certain sums of money to which they were not entitled, and Defendants are thus liable to account and pay such amounts, which are to be determined at trial, to the United States and to the State of Tennessee, respectively.

## COUNT VIII
## UNJUST ENRICHMENT

139.    Relator, on behalf of herself, the United States, and the State of Tennessee re-alleges and incorporates paragraphs 1 through 138 above, as if set forth herein verbatim.

140.    This is a claim for the recovery of monies by which Defendants have been unjustly enriched.

141.    As described above, Defendants received, and/or have continued to maintain control over, monies of the United States and the State of Tennessee to which they are not entitled.

142.    By directly or indirectly obtaining monies of the United States and the State of Tennessee to which they were not entitled, as described above, Defendants were unjustly enriched and are liable to account and pay such amounts, or the proceeds therefore, which are to be determined at trial, to the United States and to the State of Tennessee, respectively.

## VII.    PRAYERS FOR RELIEF

WHEREFORE, Relator, on behalf of herself, the United States, and the State of Tennessee demands and prays that judgment be entered in her favor against Defendants, as follows:

1.  On Counts I through III, under the Federal False Claims Act, for triple the amount of the United States' damages plus interest and such civil penalties as are allowable by

law, together with the costs of this action and such other and further relief as may be just and proper.

2. On Counts IV through VI, under the Tennessee Medicaid False Claims Act, for triple the amount of the State of Tennessee's damages plus interest and such civil penalties as are allowable by law, together with the costs of this action and such other and further relief as may be just and proper.

3. On Count VII, for payment by mistake of fact, for the damages sustained, plus prejudgment and post-judgment interest, costs, and all such further relief as may be just and proper.

4. On Count VIII, for unjust enrichment, for the amount of unjust enrichment, plus pre-judgment and post-judgment interest, costs, and all such further relief as may be just and proper.

5. That judgment be entered in favor of the United States and the State of Tennessee against the Defendants for actual damages, pre-judgment and post-judgment interest, litigation costs, investigative costs, disgorgement of all profits, and an accounting, to the fullest extent allowed by law, and for such further relief as may be just and proper.

Respectfully submitted,

**NEAL & HARWELL, PLC**

By: _____

W. David Bridgers, # 016603
John E. Haubenreich, # 029202
Robert A. Peal, #025629

2000 One Nashville Place
150 Fourth Avenue North
Nashville, TN 37219
(615) 244-1713

*Counsel for Plaintiff Debra Norris*

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing has been served, via first class mail postage

prepaid, upon the following:

United States Attorney's Office
Middle District of Tennessee
110 Ninth Avenue South, Suite A-961
Nashville, TN 37203

United States Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530

Office of the Attorney General and Reporter
425 5th Avenue North
P.O. Box 20207
Nashville, TN 37202

this the 3rd day of May, 2013.

_____

42