UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NORTHEASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA and | ) | |
| STATE OF TENNESSEE, *ex rel.* | ) | |
| DEBRA NORRIS, | ) | |
| | ) | |
| Plaintiffs, | ) | Civil Action No.: 2:13-cv-00035 |
| | ) | |
| v. | ) | CHIEF JUDGE SHARP |
| | ) | MAGISTRATE JUDGE BRYANT |
| MATTHEW ANDERSON, DAVID FLORENCE, | ) | |
| CINDY SCOTT, COOKEVILLE CENTER FOR | ) | JURY DEMAND |
| PAIN MANAGEMENT, P.C., PREFERRED | ) | |
| PAIN CENTER OF GRUNDY COUNTY, P.C., | ) | |
| MCMINNVILLE PAIN RELIEF CENTER, P.C., | ) | |
| and PMC MANAGEMENT, LLC, | ) | |
| | ) | |
| Defendants. | ) | |

## UNITED STATES' AND TENNESSEE'S
## AMENDED COMPLAINT IN INTERVENTION

1.     The United States of America and the State of Tennessee bring this action under the False Claims Act (FCA), 31 U.S.C. § 3729, *et seq.*, the Tennessee Medicaid False Claims Act (TMFCA), Tenn. Code Ann. § 71-5-181, *et seq.*, the Controlled Substances Act (CSA), 21 U.S.C. § 801, *et seq.*, and common law, against Matthew Anderson, David Florence, Cindy Scott, Cookeville Center for Pain Management, P.C., Preferred Pain Center of Grundy County, P.C., McMinnville Pain Relief Center, P.C., and PMC Management, LLC.  This suit seeks injunctive relief and to recover at least one million dollars that these Defendants caused the Medicare and TennCare programs to pay for (1) controlled substances that were not used for a medically accepted indication, lacked a legitimate medical purpose, or were prescribed by a nurse practitioner who was not legally authorized to prescribe those medications and who thus wrote invalid prescriptions, and (2) office visits and Medicare services that were either non-

payable or billed at an excessively high level to increase reimbursement. Anderson masterminded this scheme to falsely obtain money from government health care programs by creating a group of four pain management clinics that he and his management company PMC controlled, but a string of sham physician owners purportedly owned. These clinics then caused the submission of false claims for payment to Medicare and TennCare.

2.      The United States and Tennessee bring this action to recover treble damages and civil penalties arising from violations of the FCA and TMFCA, to recover damages and other monetary relief under the common law theories of unjust enrichment and payment by mistake, and to obtain civil penalties and injunctive relief under the CSA.

### Jurisdiction and Venue

3.      This Court has jurisdiction over this action under 31 U.S.C. §§ 3730(a) and 3732(b), 21 U.S.C. § 842(c)(1), and 28 U.S.C. §§ 1331, 1345 and 1367(a).

4.      Venue lies in the Middle District of Tennessee pursuant to 28 U.S.C. § 1391(b) and 31 U.S.C. § 3732(a), because a substantial part of the events and omissions giving rise to the claims alleged occurred in this District and because Defendants Cindy Scott and Cookeville Center for Pain Management, P.C., reside here.

5.      This Court may exercise personal jurisdiction over Defendants Anderson and Florence pursuant to 31 U.S.C. 3732(a) and because they transacted business in this District during the relevant period.

6.      This Court may exercise personal jurisdiction over Defendants Cindy Scott and Cookeville Center for Pain Management, P.C., pursuant to 31 U.S.C. 3732(a) and because they reside here or are located in and transact business in this District.

7.      This Court may exercise personal jurisdiction over Defendants Preferred Pain

Center of Grundy County, P.C., McMinnville Pain Relief Center, P.C., and PMC Management, LLC, pursuant to 31 U.S.C. 3732(a).

## Parties

8.     Plaintiff United States brings this action on behalf of the Department of Health and Human Services (HHS) and the Centers for Medicare & Medicaid Services (CMS), which administer the Medicare and Medicaid programs, and on behalf of the Department of Justice, as delegated to the Drug Enforcement Administration (DEA), which regulates the distribution of controlled substances under the authority of the CSA.

9.     Plaintiff Tennessee brings this action on behalf of its State Medicaid Program, known as TennCare.

10.     Relator Debra Norris (Norris) is an individual who resides in Cookeville, Tennessee.   She previously worked as the office manager at Cookeville Pain Consultants of Putnam County, P.C, from May 2012 through November 2012.  On May 3, 2013, she filed a *qui tam* action against Anderson, Florence, Cookeville Center for Pain Management, P.C., Preferred Pain Center of Grundy County, P.C., McMinnville Pain Relief Center, P.C., and other defendants.

11.     Defendant Matthew Anderson (Anderson) is a chiropractor who resides in Lenoir City, Tennessee.   He was the managing agent and shadow owner of Spine and Medical Associates of Roane County, P.C., Spinal Pain Solutions, P.C., Spine and Medical Associates of Grundy County, P.C., Preferred Pain Center of Grundy County, P.C., Cookeville Pain Consultants of Putnam County, P.C., Cookeville Center for Pain Management, P.C., and McMinnville Pain Relief Center, P.C (collectively the four Pain Clinics) at all material times. He first managed these four Pain Clinics in his individual capacity and later, after he created his

company Defendant PMC Management, LLC, through his role as the sole owner and employee of PMC.

12.     Defendant David Florence (Florence) is a doctor of osteopathy who lives in Manchester, Tennessee.  Florence previously was listed as the owner of, and served as the medical director of, Spine and Medical Associates of Roane County, P.C., Spine and Medical Associates of Grundy County, P.C., and Cookeville Pain Consultants of Putnam County, P.C. Florence has also solely owned and served as medical director of the Center for Advanced Medicine in Manchester, Tennessee (Manchester Clinic), which is a pain management clinic, and served as a supervising physician for Rocky Top Medical in Altamont, Tennessee from 2010 through the present.

13.     Defendant Cindy Scott (Scott) is a nurse practitioner who lives in Nashville, Tennessee.  Scott worked as the nurse practitioner at Cookeville Center for Pain Management, P.C. in relevant periods.

14.     Defendant Cookeville Center for Pain Management, P.C., is a Tennessee company with its principal office in Cookeville, Tennessee.  At relevant times to this Complaint, Cookeville Center operated a pain clinic in Cookeville.

15.     Defendant Preferred Pain Center of Grundy County is an inactive Tennessee corporation with its principal office in Gruetli Laager, Tennessee.  At relevant times to this Complaint, Grundy Pain Center operated a pain clinic in Gruetli Laager.

16.     Defendant McMinnville Pain Relief Center, P.C., is a Tennessee company with its principal office in McMinnville, Tennessee.  At relevant times to this Complaint, McMinnville Pain Center operated a pain clinic in McMinnville.

17.     Defendant PMC Management, LLC (PMC), is a Tennessee management company

that Anderson created on February 25, 2013. At material times in this complaint, Anderson managed the four Pain Clinics through PMC after its creation. Anderson is the President, sole owner, and sole employee of PMC, and he controlled PMC. PMC constitutes an alter ego of Anderson. They have a unity of interest and have disregarded any separate entity. Anderson has dominated PMC's financial assets, and Anderson has always used PMC as his own instrumentality. If PMC were not responsible as an alter ego, it would promote injustice.

**The Applicable Statutes**

**A.      The Controlled Substances Act**

18.     The CSA regulates entities that dispense controlled substances by establishing controls over all stages of the chain of distribution of controlled substances in the United States, including practitioners, through a closed and monitored system which makes it unlawful to manufacture, distribute, dispense, or possess any controlled substance except as authorized by the CSA. 21 U.S.C. § 801, *et seq.* The Attorney General is authorized to promulgate regulations for "the registration and control of the manufacture, distribution, and dispensing of controlled substances." 21 U.S.C. § 821.

19.     Under the CSA, "controlled substances are strictly regulated to ensure a sufficient supply for legitimate medical . . . purposes and to deter diversion of controlled substances to illegal purposes. The substances are regulated because of their potential for abuse and likelihood to cause dependence when abused and because of their serious and potentially unsafe nature if not used under the proper circumstances." 75 Fed. Reg. 61,613 – 61,617 (Oct. 6, 2010) (DEA Policy Statement, "Role of Authorized Agents in Communicating Controlled Substance Prescriptions to Pharmacies").

20.     Controlled substances are organized into schedules according to the

5

characteristics of each substance: drugs in Schedule I have the greatest potential for abuse and do not have legitimate medical uses, whereas drugs in Schedule V have legitimate medical uses and have the least potential for abuse. 21 U.S.C. § 812. Schedule II controlled substances have a high potential for abuse but also have a currently accepted medical use in medical treatment in the United States, but with significant restrictions because of their potential for abuse. 21 U.S.C. § 812(b)(2).

21.     Under the CSA, a practitioner is a physician, dentist, veterinarian, or other individual licensed, registered, or otherwise permitted, by the United States or the jurisdiction in which he/she practices, to dispense a controlled substance in the course of professional practice, but does not include a pharmacist or a pharmacy. 21 C.F.R. § 1300.01(b)(7).

22.     Prescriptions for Schedule II through V controlled substances "must be issued for a legitimate medical purpose by an individual practitioner acting in the usual course of his [or her] professional practice." 21 C.F.R. § 1306.04. Orders purporting to be a prescription – but which are not issued in the usual course of professional practice – do not qualify as prescriptions under the CSA and subject the individual who prescribed those prescriptions to penalties under the CSA. 21 U.S.C. § 829; 21 C.F.R. § 1306.04.

23.     If a person dispenses a controlled substance in violation of the CSA § 829, he or she is liable for a civil penalty of up to $25,000 for each violation and is subject to an injunction tailored to restrain against further violations of the CSA. 21 U.S.C. §§ 842(a)(1) and (c)(1), 843(f).

## B.     The Federal False Claims Act

24.     The FCA provides, in pertinent part, that a person who:

(A)     knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval; [or]

6

(B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim . . . is liable to the United States Government [for statutory damages and such penalties as are allowed by law].

31 U.S.C. § 3729(a)(1)(A) -(B) (2010).

25. The FCA further provides:

the terms knowing and knowingly –
      a) mean that a person, with respect to information –
          (i) has actual knowledge of the information;
          (ii) acts in deliberate ignorance of the truth or falsity of the information; or
          (iii) acts in reckless disregard of the truth or falsity of the information; and
      b) require no proof of specific intent to defraud[.]

31 U.S.C. § 3729(b)(1).

26. The FCA provides that a person is liable to the United States Government for three times the amount of damages that the Government sustains because of the act of that person, plus a civil penalty of $5,500 to $11,000 per violation. 31 U.S.C. § 3729(a)(1).

## C. The Tennessee Medicaid False Claims Act

27. The TMFCA, Tenn. Code Ann. §§ 71-5-181 to -185, provides in pertinent part that a person who:

(a)(1)(A) Knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval under the Medicaid program;

(a)(1)(B) Knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim under the Medicaid program . . . is liable to the state for a civil penalty of not less than five thousand dollars ($5,000) and not more than twenty-five thousand dollars ($25,000), adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990, compiled in 28 U.S.C. § 2461 note; Public Law 101-410, plus three (3) times the amount of damages which the state sustains because of the act of that person.

. . .

(b) For purposes of this section, "knowing" and "knowingly" mean that a person, with respect to information:

7

(1) Has actual knowledge of the information;

(2) Acts in deliberate ignorance of the truth or falsity of the information; or

(3) Acts in reckless disregard of the truth or falsity of the information, and no proof of specific intent to defraud is required.

Tenn. Code Ann. § 71-5-182.

## The Federal Health Care Programs

28.     **Medicare.**  Congress established the Medicare Program in 1965 to provide health insurance coverage for people age 65 or older and for people with certain disabilities or afflictions.  *See* 42 U.S.C. §§ 426, 426a.

29.     Medicare is funded by the federal government and administered by the Centers for Medicare and Medicaid Services (CMS), which is part of the United States Department of Health and Human Services (HHS).

30.     The Medicare program consists of four parts:  A, B, C, and D.  Defendants here submitted, or caused to be submitted, claims under Medicare Parts B and D.

31.     **Medicare Part B Program**. Medicare Part B covers services like doctors' and nurse practitioners' visits and medical supplies.  At relevant times, Cahaba was the Medicare Administrative Contractor (MAC) that administers Medicare Part B claims in Tennessee.

32.     To obtain Medicare Part B reimbursement for services provided by a nurse practitioner, a nurse practitioner must, in pertinent part, be legally authorized to perform the services in the States where they are performed; not perform services that are otherwise excluded from coverage because of one of the statutory exclusions; and perform services while working in collaboration with a physician as provided for by state law.  42 C.F.R. § 410.75.

33.     To obtain Medicare and Medicaid reimbursement for certain outpatient items or services, providers and suppliers submit a claim form known as the CMS 1500 form (CMS

1500), or its electronic equivalent known as the 837P form. Among the information the provider or supplier includes on a CMS 1500 or 837P form are certain five-digit codes, including Current Procedural Terminology codes (CPT codes) and Healthcare Common Procedure Coding System (HCPCS) codes, that identify the services rendered and for which reimbursement is sought, and the unique billing identification number of the "rendering provider" and the "referring provider or other source." CMS assigns reimbursement amounts to CPT and HCPCS codes.

34. Medicare providers who seek reimbursement for office visits with established patients are required to use one of the range of CPT codes for Evaluation and Management services (E&M) from 99211 through 99215 on their claims. *See* 45 C.F.R. § 162.1002.

35. To be paid for CPT code 99214, the office visit must have had at least two of these three key components: a detailed history, a detailed examination, and/or medical decision-making of moderate complexity. The presenting problem(s) for these visits will usually be of moderate to high severity, and the face-to-face visit will usually last for 25 minutes. American Medical Association, Current Procedural Terminology (4th ed. 2012).

36. Medicare providers who seek reimbursement for providing trigger point injections to patients are required to use CPT code 20552 or 20553.

37. Medicare providers who seek reimbursement for providing nerve blocks to patients are required to use CPT code 64445, 64413, 64418, or 64421.

38. When a medically necessary, significant, and separately identifiable E&M service is performed in addition to a drug administration such as an injection, the appropriate E&M code should be reported with modifier -25. Medicare Claims Processing Manual, Ch. 12, § 30.6.7(D).

39. **Medicare Part D Program**. In 2003, Congress passed the Medicare Prescription Drug, Improvement, and Modernization Act (MMA), Pub. L. 108-173, 117 Stat. 2066, which

established a voluntary prescription drug benefit program for Medicare enrollees known as Medicare Part D. An individual is eligible to enroll in Part D if the individual lives in the service area of a Part D plan and is entitled to Medicare benefits under Part A or enrolled under Part B. 42 U.S.C. § 1395w-101(a)(3)(A); 42 C.F.R. § 423.30(a).

40. Unlike coverage in Medicare Part B, Part D coverage is not provided within the traditional Medicare program. Medicare Part D is based on a private market model. Medicare contracts with private entities known as Part D Plan "Sponsors" to administer prescription drug plans.

41. Part D benefits are delivered by a Part D Plan Sponsor, which is either a prescription drug plan, a Medicare Advantage organization that offers a Medicare Advantage prescription drug plan (MA-PD plan), a Program of All-inclusive Care for the Elderly (PACE) organization offering a PACE plan including qualified prescription drug coverage, or a cost plan offering qualified prescription drug coverage. 42 C.F.R. § 423.4.

> **Part D Plan Sponsors Submit Prescription Drug Events for Drugs Covered under Medicare Part D**

42. When a pharmacy dispenses a drug to a Medicare beneficiary, it submits an electronic claim to the beneficiary's Part D plan and receives reimbursement from the Part D Plan Sponsor for the costs not paid by the beneficiary.

43. The Part D Plan Sponsor then notifies CMS that a drug has been purchased and dispensed through a document called a Prescription Drug Event (PDE) record, which includes data elements about the drug dispensed, the prescription, and the payment to the pharmacy.

44. Each PDE that is submitted to CMS is a summary record that documents the final adjudication of a dispensing event based upon claims received from pharmacies and serves as the request for payment for each individual prescription submitted to Medicare under the Part D

program.  The data contained in PDEs are data related to payment of claims.  The Integrated Data Repository (IDR) process date is the date when the PDE is transmitted to CMS, such that CMS is informed of the PDE by the Part D Plan Sponsor.

45.     In addition, CMS uses the information in the PDE at the end of the payment year to reconcile its advance payments to the sponsor with actual costs the plan sponsor incurred.  *See* "Updated Instructions:  Requirements for Submitting Prescription Drug Event Data (PDE)" (April 27, 2006).

> **CMS Makes Three Types of Payments to Part D Plan Sponsors**

46.     Throughout the year, CMS makes prospective payments to Part D Plan Sponsors for three subsidies based on the Sponsors' approved bids:  (1) the direct subsidy designed to cover the Sponsor's cost of providing the benefits; (2) the low-income cost-sharing subsidy; and (3) the reinsurance subsidy.

47.     The direct subsidy (a monthly capitated payment) is paid to the Part D Plan Sponsor in the form of advance monthly payments equal to the Part D Plan's standardized bid, risk adjusted for health status as provided in 42 C.F.R. § 423.329(b), minus a monthly beneficiary premium as determined in 42 C.F.R. § 423.315(b).  In other words, CMS pays a monthly sum to the Part D Plan Sponsor for each Part D beneficiary enrolled in the plan.

48.     CMS also makes payments to the Part D Plan Sponsor for premium and cost sharing subsidies on behalf of certain subsidy-eligible individuals as provided in 42 C.F.R. § 423.780 and 42 C.F.R. § 423.782.  Cost-sharing subsidies for qualifying low-income individuals are called "Low-Income Cost Sharing Subsidies (LICS) and are documented and reconciled using PDE data submitted to CMS.

49.     Part D sponsors who fail to submit required claims-level information contained in

the PDE to CMS risk having to return the monthly payments to CMS during reconciliation. *See* 42 C.F.R. § 423.343(b), (c)(2) and (d)(2). In addition, Part D Sponsors are responsible for correcting submitted PDE data they determine are erroneous. *See* "Updated Instructions: Requirements for Submitting Prescription Drug Event Data (PDE)" at 4 (April 27, 2006).

50.     After the close of the plan year, CMS is responsible for reconciling the prospective payments to the Part D Sponsor's actual allowable costs by relying upon data elements submitted by Sponsors in their PDE records.

> **Part D Plan Sponsors and Their Contractors Certify Compliance with All Applicable Federal Laws, Regulations and CMS Instructions**

51.     In order to receive Part D funds from CMS, Part D Plan Sponsors, their authorized agents, employees, and contractors are required to comply with all applicable federal laws, regulations, as well as CMS instructions.

52.     By statute, all contracts between a Part D Plan Sponsor and HHS must include a provision whereby the Plan Sponsor agrees to comply with the applicable requirements and standards of the Part D program as well as the terms and conditions of payment governing the Part D program. 42 U.S.C. § 1395w-112.

53.     Medicare Part D Plan Sponsors must also certify in their contracts with CMS that they agree to comply with all federal laws and regulations designed to prevent fraud, waste, and abuse. 42 C.F.R. § 505(h)(1).

54.     CMS regulations require that all subcontracts between Part D Plan Sponsors and downstream entities contain language obligating the pharmacy to comply with all applicable federal laws, regulations, and CMS instructions, including the CSA. 42 C.F.R. § 423.505(i)(4)(iv).

55.     A Part D Plan Sponsor is required by federal regulation to certify to the accuracy,

completeness and truthfulness of all data related to the payment. This provision, entitled "Certification of data that determine payments," provides in relevant part, as follows:

> (1) General Rule. ***As a condition for receiving a monthly payment*** . . . ***the Part D Plan sponsor agrees that*** its chief executive officer (CEO) chief financial officer (CFO), or ***an individual*** delegated the authority to sign on behalf of one of these officers, . . . ***must request payment under the contract on a document that certifies*** (based on best knowledge, information and belief) the ***accuracy, completeness, and truthfulness*** of all data related to payment.
> . . .
> (2) [Part D Sponsor] Certification of Claims Data: The CEO, CFO, or an individual delegated with the authority to sign on behalf of one of these officers, . . . must certify (based on best knowledge, information and belief) that the claims data it submits . . . are accurate, complete and truthful and acknowledge that the claims data will be used for the purpose of obtaining Federal reimbursement.

42 C.F.R. § 423.505(k)(1) & (3) (emphasis added).

56. All approved Part D Plan Sponsors who received payment under Medicare Part D in benefit years relevant to this case submitted the required attestations for data submitted that related to payment. 42 C.F.R. § 423.505(k).

57. The "Certification of data that determines payments" provision of the applicable regulation further provides: "[i]f the claims data are generated by a related entity, contractor, or subcontractor of a Part D plan sponsor, the entity, contractor, or subcontractor must similarly certify (based on best knowledge, information, and belief) the accuracy, completeness, and truthfulness of the data and acknowledge that the claims data will be used for the purposes of obtaining Federal reimbursement." 42 C.F.R. § 423.505(k)(3).

58. Compliance with the requirement that PDE data submitted by the Plan Sponsor is "true, accurate, and complete" is a condition of payment to the Plan Sponsor under the Medicare Part D Program. *Id*.

59. Medicare only covers drugs that are used for a medically accepted indication, which means a use that is approved under the Food, Drug, and Cosmetic Act, or a use which is

supported by one or more citations included or approved for inclusion in one of the specified compendia.  42 U.S.C. § 1395w-102(e)(1) & (e)(4); 42 U.S.C. § 1396r-8(g)(1)(B)(i) & (k)(6); 42 C.F.R. § 423.100.

60.     PDEs submitted to Medicare for drugs that do not have a medically accepted indication do not contain accurate, complete and truthful information about all data related to payment.

61.     Medicare only covers drugs that are dispensed upon a prescription.  42 U.S.C. § 1395w-102(e); 42 C.F.R. § 423.100.  A "Part D sponsor may only provide benefits for Part D drugs that require a prescription if those drugs are dispensed upon a valid prescription."   42 C.F.R. § 423.104(h).   A valid prescription must comply "with all applicable State law requirements constituting a valid prescription."  42 C.F.R. § 423.100.

62.     Part D plans may also exclude drugs from payment if the drugs are not reasonable and necessary for the diagnosis or treatment of illness or injury or to improve functioning of a malformed body part.  42 U.S.C. § 1395w-102(e)(3) (incorporating by reference 42 U.S.C. § 1395y(a)).

63.     Prescriptions for controlled substances that are not issued for a legitimate medical purpose, such as for recreational use, are not for "medically accepted indications" and are therefore not covered Medicare Part D drugs.  32 U.S.C. § 1395w(e)(1).

64.     Prescriptions for controlled substances that are not issued for a legitimate medical purpose, such as recreational use, are not "valid prescriptions" under Tennessee law and are therefore not covered Medicare Part D drugs.  42 U.S.C. § 423.104(h).

65.     PDEs submitted to Medicare for controlled substances that are dispensed when not issued for a legitimate medical purpose by an individual practitioner acting in the usual

course of his or her professional practice do not contain accurate, complete and truthful information about all data related to payment.

66. **<u>Medicaid/TennCare</u>**. The Medicaid Program provides funding for medical and health-related services for certain individuals and families with low incomes and virtually no financial resources. 42 U.S.C. § 1396, *et seq.* Those eligible for Medicaid include pregnant women, children, and persons who are blind or suffer from other disabilities and who cannot afford the cost of healthcare. 42 U.S.C. § 1396d. The Medicaid program is a joint federal–state program. 42 U.S.C. § 1396b. If a state elects to participate in the program, the costs of Medicaid are shared between the state and the federal government. 42 U.S.C. § 1396a(a)(2). In order to receive federal funding, a participating state must comply with requirements imposed by the Social Security Act and regulations promulgated thereunder.

67. Tennessee participates in the Medicaid program pursuant to Tenn. Code Ann. §§ 71-5-101 to –199. The federal government, through CMS, provides approximately 65 percent of the funds used by the Tennessee Medicaid program to provide medical assistance to persons enrolled in the Medicaid program.

68. In return for receipt of federal subsidies, Tennessee is required to administer its Medicaid program in conformity with a state plan that satisfies the requirements of the Social Security Act and accompanying regulations. 42 U.S.C. §§ 1396–1396w; Tenn. Code Ann. § 71-5-102. In Tennessee, the Department of Finance & Administration administers the state Medicaid program through the Bureau of TennCare (TennCare). Tenn. Code Ann. § 71-5-104. TennCare operates as a special demonstration project authorized by the Secretary of Health and Human Services under the waiver authority conferred by 42 U.S.C. § 1315. The Department of Finance & Administration supervises TennCare's administration of medical assistance for

15

eligible recipients. Tenn. Code Ann. § 71-5-105 to -107. The Department of Finance & Administration is authorized to promulgate rules and regulations to carry out the purposes of TennCare. Tenn. Code Ann. §§ 71-5-124 to –134.

69. TennCare contracts with private managed care contractors (MCCs) through contracts, known as Contractor Risk Agreements (CRAs), which must follow the requirements of 42 U.S.C. § 1395mm, along with any related federal rules and regulations. Tenn. Code Ann. § 71-5-128. The MCCs contract directly with providers to provide healthcare services to eligible TennCare beneficiaries. Providers who have entered into such a contract with an MCC are known as Participating Providers. Tenn. Comp. R. & Regs. § 1200-13-13-.01(91). Pursuant to the CRAs, TennCare distributes the combined state and federal Medicaid funding to the MCCs, which then pay Participating Providers for treatment of TennCare beneficiaries. TennCare-eligible persons seeking medical assistance enroll in an MCC to receive healthcare services from a Participating Provider.

70. TennCare administers pharmacy benefits for TennCare beneficiaries through a private entity known as a pharmacy benefits manager (PBM). When presented with a prescription from a TennCare beneficiary, the pharmacy dispenses drugs to the beneficiary and then submits a claim for payment to the PBM, which reviews the claim and pays the pharmacy. The PBM in turn seeks reimbursement from TennCare for the claims it pays out to the pharmacies.

71. From January 2011 to June 1, 2013, TennCare's PBM was SXC Health Solutions, which was then commonly known as Catamaran.

72. From June 1, 2013 to the present, TennCare's PBM has been Magellan Health.

73. **TennCare Reimbursement Requirements**. The term "medical assistance,"

defined at 42 U.S.C. § 1396d and Tenn. Code Ann. § 71-5-103(7), includes payment for the cost of provision of medical services or procedures by qualified, licensed practitioners to an eligible person. TennCare will only pay for medical items and services that are within the scope of the TennCare program and that are medically necessary. Tenn. Code Ann. § 71-5-144(a).

74.    In order to be reimbursed for medical services provided to TennCare enrollees, a Participating Provider must submit claims to TennCare using a standardized process that includes standard claims forms and standardized coding. Tenn. Code Ann. § 71-5-191.

75.    To be eligible to bill and receive reimbursement for medical services provided to TennCare enrollees, a Participating Provider must possess a unique provider identification number. All claims for reimbursement must be submitted under a valid provider identification number for the identified provider. 42 C.F.R. § 455.440.

76.    Participating Providers submit claims for reimbursement for services and procedures to MCCs through either paper or electronic forms. On these forms, the Participating Provider identifies the services and procedures for which reimbursement is sought using standard, uniform code numbers, including CPT codes.

77.    A Participating Provider must properly document in the patient's medical record the service or procedure performed. 42 C.F.R. § 431.107(b)(1).

**Law Governing Osteopathic Physicians, Supervising Physicians, and Nurse Practitioners**

78.    **Tennessee Laws Governing Osteopathic Physicians**. Osteopathic physicians must comply with all regulations under the CSA. Tenn. Comp. R. & Regs. § 1050-02-.13(2).

79.    **Federal and Tennessee Laws Governing Nurse Practitioners**. Medicare only covers services furnished by nurse practitioners (NPs) who are authorized to practice by the State where the services are furnished and when the NP performs them while working in collaboration

with a physician. 42 C.F.R. § 410.75. Collaboration is:

> a process in which the [NP] works **with one or more physicians** to deliver health care services within the scope of the [NP's] expertise, **with medical direction and appropriate supervision** as provided for in jointly developed guidelines or other mechanisms **as provided by the law of the State** in which the services are performed.

*Id.* (emphasis added).

80. Tennessee requires licensed nurse practitioners practicing in Tennessee to notify the State Board of "the name of a licensed **physician having supervision, control and responsibility for prescriptive services rendered by the nurse practitioner**." Tenn. Code. Ann. § 63-7-123(b)(1) (emphasis added); Tenn. Comp. R. & Regs. §§ 0880-6-.01, 1050-02-.15.

81. This supervising physician can be a medical doctor or an osteopathic physician. Tenn. Comp. R. & Regs. §§ 0880-6-.01, 1050-02-.01 & -.15.

82. The supervising physician shall review at least twenty percent (20%) of all patient charts monitored by the nurse practitioner every thirty (30) days. Tenn. Comp. R. & Regs. §§ 0880-6-.02, 1050-02-.15.

83. When a controlled substance has been prescribed or when prescriptions by the nurse practitioner fall outside of protocols, the supervising physician shall personally review the patient's data and certify this by their signature once every ten business days. Tenn. Comp. R. & Regs. §§ 0880-6-.02, 1050-02-.15.

84. **Nurse practitioners in Tennessee shall not prescribe Schedule II, III and IV controlled substances unless the prescription is** authorized by the formulary or expressly **approved after consulting with the NP's supervising physician before initially issuing the prescription**. Tenn. Code. Ann. § 63-7-123(b)(2)(B) (emphasis added).

85. Nurse practitioners shall only perform certain invasive procedures, including

nerve blocks, under the ***direct supervision*** of a physician, which means being "physically present in the same building as the advanced practice nurse at the time the invasive procedure is performed." Tenn. Code Ann. §§ 63-7-126(f); Tenn. Comp. R. & Regs. § 0880-6-.01 (emphasis added).

86.     Prescribing controlled substances in amounts or for durations that are not medically necessary is beyond the scope of professional practice. Tenn. Comp. R. & Regs. §§ 0880-02-.14, 1050-02-.13. Prescribing controlled substances for pain will be considered to be for a legitimate medical purpose in certain narrow circumstances, including after a documented medical history, pursuant to a written treatment plan with stated objectives, and considering the risk of medication misuse or diversion. Tenn. Comp. R. & Regs. §§ 0880-02-.14, 1050-02-.15.

### Tennessee Law Governing Pain Management Clinics

87.     **Pain Management Clinics**. Tennessee law defines a pain management clinic as:

> a privately owned facility in which a medical doctor, an osteopathic physician, an advanced practice nurse, and/or a physician assistant provides pain management services to patients, a majority of whom are issued a prescription for, or are dispensed, opioids, benzodiazepine, barbiturates, or carisoprodol, but not including suboxone, for more than ninety (90) days in a twelve-month period.

Tenn. Code Ann. § 63-1-301.

88.     As of January 1, 2012, pain management clinics in Tennessee must apply to obtain a certificate to operate as a pain management clinic. Tenn. Code Ann. § 63-1-301, *et seq*.; Tenn. Comp. R. & Reg. § 1200-34-01-.03.

89.     The certificate may only be issued if the pain management clinic meets the requirements of Tennessee law. Tenn. Code Ann. § 63-1-306.

90.     The application for such certification must include "a list of the individuals who own, co-own, *operate* or otherwise provide pain management services in the clinic as an

employee or a person with whom the clinic contracts for services." Tenn. Comp. R. & Reg. §1200-34-01-.03 (emphasis added).

91.     A Tennessee pain management clinic must have a medical director. Tenn. Code Ann. § 63-1-306. The medical director must "oversee all pain management services provided at the clinic," Tenn. Comp. R. & Reg. § 1200-34-01-.06, and "be on-site *at least twenty percent (20%) of the clinic's weekly total number of operating hours*." Tenn. Code Ann. § 63-1-310 (emphasis added); Tenn. Comp. R. & Reg. § 1200-34-01-.07.

92.     If a medical director of a pain management clinic ceases to meet the requirements of Tennessee law, the clinic must notify the Tennessee Department of Health within ten business days of another physician who satisfies the requirements. Tenn. Code Ann. § 63-1-306. Failure to do so within ten days may result in a summary suspension of the clinic's certification. *Id.*

93.     If the Tennessee Department of Health finds that a pain management clinic with a certificate "no longer meets any requirement," the Department of Health may impose disciplinary action against the pain management clinic and against a practitioner providing services at the clinic, including revoking the clinic's pain management clinic certificate and disciplining the practitioner. Tenn. Code Ann. §§ 63-1-307 & -311. Without the pain management clinic certificate, a medical practice can no longer operate as a pain management clinic. *See* Tenn. Code Ann. § 63-1-301, *et seq*.; Tenn. Comp. R. & Reg. § 1200-34-01-.03.

94.     Violations of these rules constitute grounds for disciplinary action against a practitioner providing services at a pain management clinic by the provider's licensing board. Tenn. Code Ann. § 63-1-311.

**The Fraud Scheme**

**A.    The Sham Ownership of the Four Pain Clinics by a String of Physicians**

95.    Anderson devised a scheme to operate pain management clinics in Middle and East Tennessee and recruited a string of physicians to serve as the sham owners of these clinics. Through this scheme, Anderson tried to conceal his true owner role and avoid liability for wrongdoing at the four Pain Clinics.

96.    During the period between 2005 and 2010, Anderson told a physician that only physicians could own a medical clinic that primarily treated pain.  At other times relevant to this complaint, Anderson told several clinic employees that the reason he used physicians to serve as the clinic owners on paper was because a non-physician, chiropractor like himself could not own a medical practice.  Anderson further instructed clinic employees that – if the State ever came and asked questions about him – they should never say that Anderson was the Clinics' owner and should not even mention his name.

97.    Anderson treated the sham physician owners as employees of the pain management clinics that they purportedly owned.  Certain physicians did not even realize that they were serving as the owner of these pain management clinics at relevant times.

98.    Anderson – through nurse practitioner Cindy Scott – ran the Cookeville Pain Clinic as what was, in essence, a "prescription mill" and a "narcotics delivery system," commonly known as a "Pill Mill."

**Cookeville Pill Mill**

99.    In Fall 2011, Anderson met with representatives of a medical clinic in Cookeville that was then owned by Dr. Clarence Jones.  At the meeting, Anderson said that he was interested in taking over the practice and that he already owned two other pain clinics, one in

Harriman, Tennessee and one in Gruetli Laager, Tennessee. Anderson said that Jones' clinic would need to become licensed as a pain management clinic as per new state regulations since the majority of Dr. Jones' patients received pain pills. Anderson said he would bring in a nurse practitioner to take over seeing patients. A nurse practitioner is a mid-level practitioner who is licensed to provide health care under the supervision of a physician.

*1st Sham Physician Owner:  Defendant Dr. David Florence*

100. Anderson recruited Florence to serve as supervising physician for the Cookeville and Harriman clinics. Anderson presented himself to Florence as the clinics' owner.

101. On April 10, 2012, Cookeville Pain Consultants of Putnam County (Cookeville Pill Mill I) was formed with Florence listed on corporate records as its sole owner. But according to Florence, at no time during his involvement with Cookeville Pill Mill I did Florence realize that he was its owner.

102. Florence did not pay any money to acquire Cookeville Pill Mill I.

103. On May 18, 2012, a Medicare enrollment application was submitted for Cookeville Pill Mill I.

104. On June 6, 2012, Florence signed an application for Cookeville Pill Mill I to be certified as a pain management clinic. The application listed Dr. Clary Foote as the medical director and Scott as the nurse practitioner.

105. In actuality, although Anderson asked Foote to serve as Cookeville Pill Mill I's medical director, Foote decided not to do so and never served in that role.

106. Around this time, Anderson terminated Florence as Cookeville Pill Mill I's owner and medical director due to an unrelated matter that did not involve Florence's medical judgment or role at any of the four Pain Clinics.

107.    In approximately Fall 2012, Anderson recruited Dr. Councill Rudolph as Florence's replacement at two of the four Pain Clinics and to serve as the new medical director of the McMinnville pain clinic.  Rudolph understood that he would be their medical director and owner on paper, but not in practice.  Rudolph did not believe that he was the true owner of these Pain Clinics.

### 2nd Sham Physician Owner:  Dr. Councill Rudolph

108.    On October 5, 2012, Rudolph applied for certification of Cookeville Pill Mill I as a pain management clinic, listing himself as its medical director.

109.    On November 15, 2012, Florence signed a document that sold Cookeville Pill Mill I to its successor, Defendant Cookeville Center for Pain Management, PC (Cookeville Pill Mill II) (collectively Cookeville Pill Mill), which was purportedly owned by Rudolph.

110.    Florence did not receive any payment for the sale of Cookeville Pill Mill I.

111.    Cookeville Pill Mill II continued the operations of Cookeville Pill Mill I at the same location under the new corporate name.

112.    On November 15, 2012, Cookeville Pill Mill entered into a management agreement and nominee agreement with Defendant PMC Management.  However, PMC did not legally exist as a company until February 25, 2013, and PMC did not have a bank account until June 28, 2013.

113.    On November 30, 2012, Cookeville Pill Mill applied for certification as a pain management clinic, listing Rudolph as the sole owner and medical director and Scott as the nurse practitioner.

114.    Rudolph received a salary for his role with Anderson's four Pain Clinics.

115.    As described in more detail below, Anderson terminated Rudolph's role with the

clinics after Rudolph repeatedly complained about Scott's practices of writing excessive prescriptions for controlled substances.

### 3rd Sham Physician Owner:  Dr. James Wadzinski

116.    Anderson then recruited Wadzinski to oversee the mid-level practitioners at Anderson's pain clinics in Cookeville, Gruetli Laager and Harriman.  On December 12, 2013, Wadzinski was added as an additional medical director for Cookeville Pill Mill and listed as an owner of ten percent of the Pill Mill.

117.    On January 1, 2014, the entire ownership of Cookeville Pill Mill was transferred from Rudolph to Wadzinski.  On the same date, Wadzinski applied for certification of the Cookeville Pill Mill as a pain management clinic, with himself listed as the clinic's sole owner and medical director, and signed management and nominee agreements with PMC.

118.    Wadzinski received monthly salary payments from Anderson for his medical director role.  Within approximately two months, Wadzinski resigned his role in total, since he was concerned about potential fraud at both the Harriman and Cookeville clinics.

### 4th Sham Physician Owner:  Dr. Rudolph Again

119.    In Spring 2014, Anderson contacted Rudolph and said he had a really big problem.  Anderson said that Cookeville Pill Mill was his biggest and most profitable clinic, but that Scott had quit working there.  Anderson said he had already closed his McMinnville Pain Clinic and was in the process of closing the Gruetli Laager Pain Clinic.  On March 4, 2014, Wadzinski transferred the ownership of Cookeville Pill Mill back to Rudolph for a listed purchase price of $1.

120.    On March 20, 2014, at Anderson's request, Rudolph signed an agreement that Anderson gave him, which terminated PMC's management, nominee, and business associate role

with Cookeville Pill Mill.

121. On April 27, 2014, Wadzinski cancelled Cookeville Pill Mill's pain clinic certification. The clinic is no longer operating.

**The Harriman Pain Clinic**

*1st Sham Physician Owner: Dr. James Bachstein*

122. Anderson and Scott recruited Dr. James Bachstein as the original sham physician owner of the Harriman Pain Clinic. They did so by representing to him that the new clinic would treat patients with pain holistically, using chiropractic services, physical therapy and medication. Bachstein understood that only physicians – not chiropractors – could own pain clinics. Anderson arranged to establish the corporation and issued stock in it to Bachstein. Anderson originally worked part-time at the Harriman clinic providing chiropractor services.

123. Aside from his purported owner role, Bachstein understood that his role would be to supervise Scott as the clinic's nurse practitioner and that Anderson would run the clinic. Anderson paid Bachstein a salary for this supervisory role.

124. In 2010, Bachstein resigned from the clinic, since he believed that it was not operating holistically and since Bachstein had become uncomfortable with excessive medication prescriptions being prescribed out of the clinic.

*2nd Sham Owner: Dr. Florence*

125. On August 13, 2010, Florence signed a document acquiring the stock of Spine and Medical Associates of Roane County, P.C. (Harriman Pain Clinic I), for a listed price of $100, from Bachstein.

126. In actuality, Florence did not pay any money to acquire Harriman Pain Clinic I.

127. On August 13, 2010, Florence signed a consent action incorporating Harriman

Pain Clinic I as Spine and Medical Associates of Roane County, P.C. On the same date, Florence signed nominee and management agreements with Anderson, which appointed Anderson personally as Harriman Pain Clinic I's managing agent.

128.    On December 27, 2011, Harriman Pain Clinic I submitted an application for certification of pain management clinic, listing Florence as the medical director.

129.    At no time during his purported ownership of Harriman Pain Clinic I did Florence believe that he was its owner. Instead, he believed himself to be the medical director, and he drew a monthly salary for that role.

130.    In 2012, Anderson contacted Dr. Clary Foote and said that he owned two or three clinics, including a pain clinic in Cookeville. Anderson asked Foote to serve as the supervising physician for Harriman Pain Clinic I's nurse practitioner, Terry South. Foote agreed and began drawing a salary for that role. Anderson did not discuss Foote becoming an owner of the Harriman Pain Clinic.

131.    On February 27, 2012, Harriman Pain Clinic I submitted an application for certification of pain management clinic, listing Foote as the medical director.

### 3rd Sham Physician Owner:   Dr. Clary Foote

132.    On November 15, 2012, a bill of sale was executed, in which Florence ostensibly sold Harriman Pain Clinic I to Spinal Pain Solutions, P.C. (Harriman Pain Clinic II), which Foote purportedly owned. On the same day, a consent action by the clinic's sole director and a closing date consent action were purportedly signed by Foote.

133.    Foote did not pay any funds when he purportedly bought Harriman Pain Clinic I from Florence.

134.    Harriman Pain Clinic II continued the operations of Harriman Pain Clinic I at the

26

same location under the new corporate name.

135.    Also on November 15, 2012, a signature purporting to be Foote's appears on a management agreement appointing PMC as the managing agent for Harriman Pain Clinic II. But according to Foote, he did not know what PMC was at all during the relevant period. Moreover, PMC did not legally exist as a company until February 25, 2013.

136.    In late 2013, Foote requested a raise in salary from Anderson after Foote obtained a certification as a pain specialist. Anderson refused to give Foote any raise whatsoever, so Foote resigned as medical director.

137.    At no time during his purported ownership of Harriman Pain Clinic II did Foote believe that he was its owner.

138.    On December 12, 2013, Wadzinski signed an application for Harriman Pain Clinic II to be certified as a pain management clinic, listing himself as the medical director.

### 4th Sham Physician Owner:  Dr. Wadzinski

139.    On January 1, 2014, Foote purportedly sold Harriman Pain Clinic II to Wadzinski.

140.    On January 1, 2014, Wadzinski signed an agreement accepting ownership of Harriman Pain Clinic II and signed a management agreement appointing PMC as managing agent for the clinic.

141.    On April 21, 2014, Wadzinski signed a termination agreement terminating PMC's role with Harriman Pain Clinic. On the same day, Wadzinski sold Harriman Pain Clinic II to Terry South and Janet Pelmore.

142.    Terry South and Janet Pelmore purchased and renamed the Harriman Pain Clinic on April 21, 2014 and now run it as a new and separate entity that is unrelated to this action.

### The Gruetli Laager Pain Clinic

#### *1st Sham Physician Owner:  Dr. Florence*

143.    On August 27, 2010, the corporate charter of Spine and Medical Associates of Grundy County, P.C. (Gruetli Laager Pain Clinic I), was filed with Tennessee.  Upon information and belief, Florence was the purported owner of the clinic.  The principal office of the company at the time was in Coalmont, Tennessee.  That office later moved to Gruetli Laager, Tennessee.  Anderson was the chiropractor for this clinic.

144.    Upon information and belief, at no time during his purported ownership of Gruetli Laager Pain Clinic I did Florence believe that he was its owner.  Instead, he believed himself to be the medical director, and he drew a salary for that role.

#### *2nd Sham Physician Owner:  Dr. Rudolph*

145.    On November 15, 2012, Florence signed a document selling Gruetli Laager Pain Clinic I to successor company Preferred Pain Center of Grundy County, P.C., (Gruetli Laager Pain Clinic II), with Rudolph as the new owner.

146.    On the same date, Rudolph signed nominee and management agreements with PMC, which appointed PMC – which did not yet exist as a company – as Gruetli Laager Pain Clinic's managing agent and as a minority owner.

147.    Gruetli Laager Pain Clinic II continued the operations of Gruetli Laager Pain Clinic I at the same location under the new corporate name.

148.    On December 12, 2013, Wadzinski applied for a pain management clinic certificate for Gruetli Laager Pain Clinic II, listing himself as medical director.

#### *3rd Sham Physician Owner:  Dr. Wadzinski*

28

149.    On January 1, 2014, Rudolph transferred his ownership of Gruetli Laager Pain Clinic II to Wadzinski.   On the same day, Wadzinski signed nominee and management agreements that appointed PMC as the managing agent for Gruetli Laager Pain Clinic.

### 4th Sham Physician Owner:  Dr. Rudolph Again

150.    On March 4, 2014, Wadzinski transferred Gruetli Laager Pain Clinic II back to Rudolph for the stated price of $1.

151.    Also on March 4, 2014, Anderson gave Rudolph a termination agreement to sign, which terminated PMC's role with Gruetli Laager Pain Clinic.  Rudolph signed the agreement as requested.

152.    On April 27, 2014, Wadzinski cancelled the pain management certificate for Gruetli Laager Pain Clinic II.

### The McMinnville Pain Clinic

### Sham Physician Owner:  Dr. Rudolph

153.    On November 5, 2012, Rudolph signed a document incorporating McMinnville Pain Relief Center (McMinnville Pain Clinic).

154.    On November 15, 2012, Rudolph signed management and nominee agreements appointing PMC the managing agent for McMinnville Pain Clinic even though PMC did not yet exist as a company on that date.

155.    On November 30, 2012, Rudolph applied for certification of McMinnville Pain Clinic as a pain management clinic, with himself as its medical director on November 30, 2012 and owner.

156.    On March 4, 2014, Anderson gave Rudolph a termination agreement to sign, which terminated PMC's role with McMinnville Pain Clinic.  Rudolph signed the agreement as

requested.

**B.    Anderson's Control of the Four Pain Clinics**

157.    Anderson had near total control over the four Pain Clinics and acted as their true owner at all material times in this Complaint.  Through this arrangement of having a string of physicians as sham owners and Anderson as the true owner, Anderson and his company PMC reaped huge profits.

158.    During the period from at least 2011 through 2014, Anderson gave sham physician owners Florence, Rudolph and Foote documents to sign at times – often during meals at a restaurant – and Anderson represented that those documents pertained to the provision of medical director and supervisory physician services.  Anderson did not give copies of these documents to the physicians.  This practice created the situation in which several of the sham owners did not realize they were the "owners on paper" of the four Pain Clinics.

159.    Anderson initially had a nominee and management agreement between himself personally and Harriman Pain Clinic I.  Anderson later entered into nominee and management agreements between PMC and the four Pain Clinics.  Under these agreements, the four Pain Clinics employed Anderson, and later PMC, to, among other things, perform all day-to-day management and provide all billing services.  The PMC agreements also empowered Anderson, via PMC, to file the clinics' tax returns, provide clinic personnel and a physician to provide services at the clinics for at least twenty percent of each clinic's operating hours per week.

160.    These agreements gave Anderson and/or PMC an irrevocable right to designate a new purchaser of the Pain Clinics who would be entitled to buy the four Pain Clinics from the sham owner.  The agreements also set the purchase price of any such purchase as being for $1.

161.    In fact, during the period from approximately Summer 2012 through late 2013,

Anderson explicitly terminated sham owners Florence and Rudolph and implicitly terminated Foote.

162.    Anderson alone hired all of the four Pain Clinics' staff, including the billers and medical practitioners.

163.    Anderson alone terminated staff at the four Pain Clinics.

164.    Anderson controlled all money for the four Pain Clinics, including the bank accounts, at all material times.  Anderson signed all checks for the four Pain Clinics and was responsible for getting the taxes filed.

165.    As a practical matter, the sham physician owners had no role whatsoever in using the four Pain Clinics' bank accounts.

166.    Anderson, either individually or through PMC, oversaw all of the four Pain Clinics' Medicare and TennCare billing and caused the submission of claims for reimbursement to Medicare and TennCare.

**C.    Anderson Reaped Millions from the Four Pain Clinics**

167.    Between December 31, 2010 and April 25, 2014, Anderson wrote checks either to himself – or indirectly through PMC – from the four Pain Clinics' bank accounts totaling approximately $5,277,000.  Anderson personally signed all of these checks.

168.    None of the sham physician owners personally approved of these disbursements to Anderson or PMC.

169.    By comparison, during this same period, the sham physician owners received a mere fraction of the monies that Anderson paid to himself from the four Pain Clinics. Specifically, these payments break down as follows:

| Individual | Total Payments to Individual from four Pain Clinics | Percentage of Money Paid to Individual of the Total Amount Paid to Anderson and 4 Sham Owners |
|---|---|---|
| Florence | $82,879 | 1.47% |
| Rudolph | $134,390 | 2.39% |
| Foote | $98,360 | 1.75% |
| Wadzinski | $36,938 | .66% |
| **Anderson** | **$5,277,000** | **93.74%** |

170.    Upon information and belief, the payments to the physicians were for their medical director services, and the physicians received no financial benefit from their sham owner roles.

171.    Anderson boasted about the products of his wealth, including cars, boats and trips to luxury destinations.

**D.    Anderson and Scott Knowingly Ran a Pill Mill in Cookeville**

172.    From at least January 2011 through January 2014, Cindy Scott purported to be providing "Pain Management" treatment for chronic pain patients through medical practices, including Cookeville Pill Mill.

173.    During this period, Anderson told two nurse practitioners – nurse practitioners A and B – at two of the four Pain Clinics that they needed to write medications to accommodate the patients so they would keep coming to the clinic.  Between approximately 2010 and 2011, Anderson told nurse practitioner A to make sure that patients got all the prescriptions they requested.  Due to this pressure from Anderson, nurse practitioner A wrote more prescriptions than she otherwise would have.

174.    Anderson recruited Scott to work at Cookeville Pill Mill, where she started work in Spring 2012.

175.    Scott was known in Tennessee as a nurse practitioner who liberally prescribed

pain medication. On information and belief, her patients followed her around Tennessee when she moved from East Tennessee to Middle Tennessee and traveled long distances to see her.

176. The majority of Cookeville Pill Mill's patients paid cash, but approximately one-fourth of the patients were Medicare beneficiaries. Many of the cash patients were also TennCare beneficiaries, and TennCare paid for their diagnostic imaging, medications and urine drug screens.

177. During the period when Scott worked at Cookeville Pill Mill, Anderson pressured her to see significantly more patients per day than she wanted to see. During the prior period including 2010 through 2011, Anderson similarly directed nurse practitioner A to see more patients.

178. Scott's office visits with return patients at Cookeville Pill Mill typically lasted just five minutes and consisted mostly of Scott writing the patient prescriptions.

179. A representative sample of Scott's controlled substance prescriptions paid for by Medicare from January 2011 through January 2014 – most of which were written from Cookeville Pill Mill – indicated that she did not write the majority of them for a legitimate medical purpose and that her prescribing patterns were outside the usual course of professional practice.

E.    Anderson and Scott Disregarded Numerous Warnings about Cookeville Pill Mill

180. In 2012, Cookeville Pill Mill's Office Manager, Relator Norris, told both Scott and Anderson that she was concerned about patients lacking the proper documentation needed to support the controlled substances prescriptions Scott was writing, but nothing changed. In November 2012, rather than heeding Norris' warnings about Scott, Anderson terminated Norris.

181. During the period when he was the clinic's supervising physician, Rudolph wrote

notes in patient files at Cookeville Pill Mill, which criticized Scott's prescriptions and/or instructed her to decrease her prescriptions for pain medications. But Scott ignored these instructions.

182.    At various times, including in September 2013, Rudolph repeatedly complained to Anderson and Scott about her practices of writing excessive prescriptions for controlled substances. Rudolph also wrote notes in Scott's patient charts to this effect, indicating that she wrote prescriptions for "too many meds."

183.    Around September 2013, Rudolph gave Anderson the information on ten of Scott's patients and the controlled substances Scott was prescribing for them. Anderson replied that he would discuss this with the physician at his Harriman Pain Clinic. Later, Anderson told Rudolph that Foote said Scott's prescriptions were a little high, but not too far off. But in fact, Anderson never asked Foote for an opinion on Scott's prescriptions for controlled substances, and Foote never gave such an opinion to Anderson.

184.    Anderson also told Rudolph to stop writing notes about "too many meds" directly in Scott's patient charts and instead to write them on sticky notes in the charts.

185.    In October 2013, Cookeville Pill Mill received a letter from the Tennessee Department of Health advising that Scott was one of the top prescribers of controlled substances in Tennessee. Afterwards, in November 2013, Rudolph believed that Scott began to decrease her prescriptions for controlled substances somewhat.

186.    By December 2013, Rudolph observed Scott return to her prior prescribing patterns. Rudolph then began writing notes in a high percentage of Scott's charts about her prescribing too much medicine.

187.    Between approximately October and December 2013, Scott contacted Anderson

34

and complained about Rudolph and told Anderson that he needed to decide which one of them he wanted to keep.

188.    In January 2014, rather than heeding Rudolph's requests to curtail Scott's prescriptions, Anderson terminated Rudolph and replaced him with Wadzinski.

189.    Afterwards, in January 2014, Wadzinski complained repeatedly to Anderson about Scott writing too many narcotics prescriptions.  Wadzinski told Anderson that all of the Cookeville Pill Mill patients were hooked on large amounts of drugs and that Scott's narcotics practices were out of control.  Wadzinski also wrote notes in Scott's patient files indicating that she was prescribing too much medication.

190.    Neither Anderson nor Scott followed the instructions of the clinic's two medical directors to significantly reduce the Cookeville prescriptions for controlled substances.

191.    Anderson did not fire Scott even though he had the authority to do so.  She stopped working at the clinic only when she unilaterally quit.

**F.    Florence Pill Mills**

192.    Upon information and belief, Florence only came to Cookeville Pill Mill once, on approximately August 1, 2012 – while he was its sham owner.  On that day, Florence saw approximately 70 patients and signed off on over 1000 patient charts.  In doing so, Florence was not exercising medical judgment, but was instead giving rote signatures with no analysis of the individual patient record.

193.    From at least January 2011 through July 2014, Florence did not operate a legitimate medical practice at the various medical clinics where he practiced, but was instead engaged in a scheme to distribute and dispense controlled substances illegally and to defraud Medicare and TennCare of money by running a Pill Mill at his Center for Advanced Medicine.

194.    At the various clinics where Florence worked – including both the Center for Advanced Medicine and at Rocky Top Medical – a review of a representative sample of his controlled substance prescriptions paid for by Medicare indicated that Florence did not write the majority of them for a legitimate medical purpose and that his prescribing patterns were outside the usual course of professional practice.

## G.    Anderson's Upcoding Scheme at All Four Pain Clinics

195.    Anderson was familiar with the codes that the four Pain Clinics' billers were using for Medicare claims.  At least one of the billers frequently printed out and gave to Anderson the Medicare Remittance Advices and/or Explanation of Benefits statements, which detailed all of the CPT Procedure Codes and modifier codes, including modifier -25, that the four Pain Clinics had billed to, and received reimbursements for, from Medicare.

196.    Anderson was familiar with all five levels of CPT codes for established patient office visits and the requirements for billing those codes.

197.    In mid-2013, Anderson instructed the billers at the four Pain Clinics to start billing CPT code 99214 for established patient office visits, instead of the lower CPT code 99213, which the four Pain Clinics had previously used.

198.    When giving this instruction to the billers, Anderson also gave them a document that discussed how billing for office visits at the 99214 level could potentially reap thousands more dollars per year.

199.    Although the billers questioned Anderson as to whether the 99214 code was appropriate during the 2013 period, Anderson again told them to use that code.

200.    Following Anderson's instructions, during the period including May 2013 through December 2013, the four Pain Clinics billed Medicare for claims with CPT code 99214, when as

Anderson knew, the four Pain Clinics had not provided patients with services that were reimbursable under that CPT code.

## H. Non-Compliance with Tennessee's State Law Requirements

201.    Anderson was familiar with the Tennessee law governing pain management clinics and supervising physicians for nurse practitioners, and he knew that this law applied to the four Pain Clinics.  In fact, in approximately Fall 2011 or January 2012, while Anderson was in discussions to take over the Cookeville Pill Mill from its prior owner whom Relator Norris then worked for, Anderson told Norris about the requirement that a doctor had to be onsite for at least twenty percent of the time.  Upon information and belief, Scott also told Anderson that he had to get a doctor at the Cookeville Pill Mill because her license was at stake.

202.    **Harriman**.  For the period from May 25, 2011 through February 26, 2012, Anderson caused Florence to be listed as the supervising physician for nurse practitioner Elizabeth Cox, who was performing all of the services and writing all prescriptions – including those for controlled substances – at the Harriman Pain Clinic.

203.    During the period from January 1, 2012 through February 26, 2012, Anderson caused Florence to be listed as the medical director of Harriman Pain Clinic I.

204.    Throughout the above periods, Florence lived in Manchester, which is approximately two hours from Harriman.

205.    In the period from approximately June 2010 through May 2011, nurse practitioner A at one of the four Pain Clinics warned Anderson numerous times that Florence was not at the clinic and was not giving her any feedback at all despite being her supervising physician.  In response, Anderson said that Florence could not get up to Harriman, since it was too far for him to travel.

206.    During this roughly nine-month period from May 25, 2011 through February 26, 2012, Cox never once met, saw, or talked to Florence.  Cox also never saw Florence reviewing any patient charts or talked to any other oversight physician.  As such, upon information and belief, and as Anderson knew, Florence did not do the following required things per Tennessee law:

- review at least twenty percent of all patient charts monitored by Cox every thirty days;
- consult with Cox before she initially issued a prescription for a controlled substance;
- review Cox's prescriptions for controlled substances once every ten business days;
- be physically present in the same building with Cox when nerve blocks were performed; and
- be on-site at Cookeville Pill Mill for at least twenty percent of its weekly operating hours when it was functioning as a pain management clinic during this period.

207.    As Anderson knew, Tennessee's supervision requirements for nurse practitioner Cox were not met during the period from May 25, 2011 through February 26, 2012, and her resulting prescriptions were not considered valid under Tennessee law.  So no Part B services or medications dispensed based upon Cox's prescriptions were reimbursable by Medicare during that period.  Nevertheless, as the managing agent and shadow owner of the Harriman Pain Clinic, Anderson caused the submission of false claims for these services during this period.

208.    **Cookeville**.  From 2006 through April 2012, nurse practitioner Scott worked at various, successive medical clinics and had supervising physicians at those respective clinics. However, as she left those clinics, those physicians ceased to supervise her, but Scott did not inform the Tennessee Board of Nursing that those physicians were no longer serving as her supervising physician.  The last such supervising physician himself informed the Board of Nursing that Scott was no longer employed by him and deleted himself as her supervising

physician as of May 2012. Around early May 2012, Scott began working as the nurse practitioner at Cookeville Pill Mill I. But Scott did *not* add a new supervising physician to her Board of Nursing records until October 15, 2012, when she listed Dr. Rudolph as her new supervising physician.

209. Around this timeframe, Anderson asked Foote to supervise Cookeville Pill Mill, and Foote went there once to meet with clinic staff and see the facility for approximately forty-five minutes. But after this one visit, Foote declined to supervise Cookeville Pill Mill due to his concern that Scott was overprescribing pain medication. Thus, as Anderson knew, Foote did not serve as either Cookeville Pill Mill's supervising physician or its medical director at any time, and Foote never returned to the Cookeville Pill Mill again. Nevertheless, during the period from June 6, 2012 through October 4, 2012, Anderson caused Foote to be listed as the medical director of Cookeville Pill Mill I.

210. Although Florence came to Cookeville Pill Mill once on approximately August 1, 2012, he did not supervise Scott that day, since she was absent. Moreover, Florence did not perform any meaningful review of Scott's prescriptions or charts that day.

211. During the period from May 1, 2012 through October 14, 2012, as Anderson knew, Scott was performing nurse practitioner services and prescribing controlled substances, and, as the managing agent and shadow owner of the Cookeville Pill Mill, Anderson caused the submission of false claims for these services during this period.

212. Yet as Anderson knew, during this period, there was no physician who did the following required things per Tennessee law:

- review at least twenty percent of all patient charts monitored by Scott every thirty days;
- consult with Scott before she initially issued a prescription for a controlled substance;

39

- review Scott's prescriptions for controlled substances once every ten business days;
- be physically present in the same building with Scott when nerve blocks were performed; and
- be on-site at the clinic for at least twenty percent of its weekly operating hours when it was functioning as a pain management clinic during this period.

213. Upon information and belief, Anderson regularly visited all four Pain Clinics during these periods and therefore knew that there was not a supervising physician or medical director on-site at either the Cookeville or Harriman clinic.

214. Because Tennessee's supervision requirements for nurse practitioners were not met at relevant times, Medicare would not have paid for the Cookeville Pill Mill's or Harriman Pain Clinic's Part B services during the affected periods.

215. Because the prescriptions written by Scott and Cox did not constitute valid prescriptions under Tennessee law at relevant times, Medicare also would not have paid for the Part D medications during the applicable periods.

216. On information and belief, as a result of the above violations of 42 C.F.R. §410.75 and Tenn. Code Ann. § 63-1-301, *et seq.*, Medicare Part B would not have paid approximately $23,946 to Harriman Pain Clinic I and approximately $19,925 to Cookeville Pill Mill I for the relevant periods.

217. On information and belief, as a result of a lack of valid prescriptions, the Medicare Part D Plan Sponsors would not have paid approximately $49,330 to pharmacies for their Part D claims for controlled substances written by Cox and approximately $128,483 for Part D claims for controlled substances written by Scott during the applicable periods.

## I.     Specific Examples of False Claims

218.    Attached to and made part of this Complaint is Exhibit A,[1] which contains a summary chart of 23 false claims in this action.   The claims identified in Exhibit A are illustrative samples of the types of false claims submitted or caused to be submitted to Medicare and TennCare by Defendants between January 1, 2011 and July 31, 2014.

219.    **Illegitimate Controlled Substance Claims from Cookeville Pill Mill.** Anderson and Scott knowingly caused some patients to fill prescriptions for Schedule II through V narcotics that Medicare and TennCare paid for that were not used for an accepted medical indication and lacked a legitimate medical purpose.   Scott caused the submission of these false claims during the period from January 2011 through January 2014, and Anderson caused the submission of these false claims during the period from approximately Spring 2012 through January 2014.

220.    For example, Patient A was a 59 year old female patient at Cookeville Pill Mill II. Scott knew that Patient A had a pattern of filling prescriptions for Valium, but that her drug urine screens indicated that she was not actually taking that medication.  Patient A also had a history of numerous ambulance transports to the hospital for reasons consistent with drug abuse.  But in May 2013, despite this history, Scott wrote Patient A two more narcotics prescriptions, including one for Opana ER, a Schedule II controlled substance.   Medicare paid for this Opana prescription, which as Scott and Anderson knew, was not used for a medically accepted indication and lacked a legitimate medical purpose.  The morphine equivalent dose of Patient A's medications on the date in May was very high and likely resulted in patient harm.

---

[1] Exhibit A identifies the beneficiaries by letter (as they are identified herein) and omits the beneficiary identification numbers to protect patient privacy.  The United States and Tennessee will serve Defendants with a copy of Exhibit A that identifies each patient by name.

221.	Patient B was a 46 year old male patient at Cookeville Pill Mill II with a history of smoking marijuana daily.  Patient B had tested positive for marijuana several times while under Scott's care.  As Scott knew, Patient B had repeatedly tested negative for several prescribed drugs that should have appeared in his system.  At times, Patient B also tested positive for drugs that should not have been in his system. Nevertheless, on a day in May 2013 when Patient B had still more inconsistent drug urine screen results, Scott wrote Patient B prescriptions for a drug cocktail known as the "Holy Trinity" in drug diversion circles.  That cocktail included a prescription for Carisoprodol, a Schedule IV controlled substance.  Patient B had a very high morphine equivalent dose that day and had been receiving Carisoprodol prescriptions from Scott for a long time period.  Medicare paid for Patient B's prescription for Carisoprodol in May 2013, which, as Scott and Anderson knew, was not used for a medically accepted indication and lacked a legitimate medical purpose

222.	A 50 year old female patient at Cookeville Pill Mill I, Patient C had a pattern of obtaining prescriptions for Xanax from Scott, but not filling them.  Patient C also tested negative for drugs she should have tested positive for.  But Scott still wrote her two prescriptions for narcotics in August 2012, including a prescription for Oxycontin, a Schedule II controlled substance, as well as one for Oxycodone.  Combined, these two medications gave Patient C a very high morphine equivalent dose.  Medicare paid for the Oxycontin prescription, which as Scott and Anderson knew, was not used for a medically accepted indication and lacked a legitimate medical purpose.

223.	Patient D was a 56 year old male who received monthly prescriptions for Oxycodone, Oxycontin, and Xanax from Scott. The urine drug screen tests for Patient D were negative for Xanax, a Schedule IV controlled substance, indicating that Patient D was not taking

the Xanax, even though he was filling those prescriptions each month. Nonetheless, knowing that Patient D was not taking the previously prescribed Xanax, Scott continued to write Patient D Xanax prescriptions in October and November 2012. TennCare paid for those prescriptions, which as Scott and Anderson knew, were not medically necessary and lacked a legitimate medical purpose.

224.    Patient E was a 51 year old male who received monthly prescriptions for Oxycodone, Oxycontin, and Xanax from Scott. The urine drug screen tests for Patient E were negative for Xanax and Oxycodone, indicating that Patient E was not taking the Xanax and Oxycodone, even though he was filling those prescriptions each month. Xanax is a Schedule IV controlled substance, and Oxycodone is a Schedule II controlled substance. Nonetheless, knowing that Patient E was not taking the previously prescribed Xanax or Oxycodone, Scott continued to write Patient E a prescription for Oxycodone in December 2012. TennCare paid for this prescription, which as Scott and Anderson knew, was not medically necessary and lacked a legitimate medical purpose.

225.    Patient F was a 46 year old male who received monthly prescriptions for Oxycodone, Oxycontin, Xanax, and Soma from Scott. The urine drug screen tests for Patient F were negative for Xanax, a Schedule IV controlled substance, indicating that Patient F was not taking the Xanax, even though he was filling those prescriptions each month. Nonetheless, knowing that Patient F was not taking the previously prescribed Xanax, Scott continued to write Patient F Xanax prescriptions in September, October and November 2012. TennCare paid for those prescriptions, which as Scott and Anderson knew, were not medically necessary and lacked a legitimate medical purpose.

226.    **Illegitimate Controlled Substance Claims from Florence's Pill Mill**.  Florence knowingly caused some patients to fill prescriptions for Schedule II through V narcotics that Medicare paid for that were not used for an accepted medical indication and lacked a legitimate medical purpose.  Florence caused the submission of these false claims during the period from January 2011 through July 2014.

227.    Patient G was a 59 year old female at Florence's Center for Advanced Medicine. Florence had records from 2011 from Patient G's prior provider, which noted serious concern about Patient G having had two consecutive visits with stolen prescriptions and failing to bring in pills for pill counts.  Nevertheless, after Florence began treating her, he prescribed Patient G three medications with a high morphine equivalent dose in August 2012, including a prescription for Morphine ER, a Schedule II controlled substance.  Medicare paid for this prescription, which, as Florence knew, was not used for a medically accepted indication and lacked a legitimate medical purpose.

228.    Patient H was a 38 year old female patient at Florence's Center for Advanced Medicine.  In July 2011, Florence prescribed her Hydrocodone/ Acetaminophen, a Schedule II controlled substance.  Florence also prescribed Patient H two other drugs that comprise the "Holy Trinity" cocktail of abused drugs.  Less than one month later, in August 2011, an MRI of Patient H's lumbar spine did not show significant problems.  Medicare paid for the Hydrocodone/Acetaminophen, which, as Florence knew, was not used for a medically accepted indication and lacked a legitimate medical purpose.

229.    **Upcoded Claims**.  Patient I was a 53 year old female.  Cookeville Pill Mill II billed Medicare for an August 19, 2013 office visit with Patient I with CPT code 99214, with modifier -25, and for one trigger point injection, two nerve blocks for her, and an echo guide for

44

biopsy that same day. Medicare paid for that office visit at the 99214 reimbursement level. But as Anderson knew, Medicare should not have been billed for, or reimbursed, the 99214 CPT code for an office visit.

230. Patient J is a 67 year old female. Gruetli Laager Pain Clinic II billed Medicare for a July 16, 2013 office visit with Patient J with CPT code 99214, with modifier -25, and for giving her five nerve blocks that day. Medicare paid for that office visit at the 99214 reimbursement level. But as Anderson knew, Medicare should not have been billed for, or reimbursed, the 99214 CPT code for an office visit.

231. Patient K was a 41 year old male. Harriman Pain Clinic II billed Medicare for an August 7, 2013 office visit with Patient K for CPT code 99214 and modifier -25. Medicare paid for that office visit at the 99214 reimbursement level. But as Anderson knew, Medicare should not have been billed for, or reimbursed, the 99214 CPT code for an office visit.

232. Patient L was a 40 year old male. McMinnville Pain Clinic billed, and received payment, for an established patient office visit with Patient L on October 31, 2013 with code 99214 and modifier -25. Medicare paid for that office visit at the 99214 reimbursement level. But as Anderson knew, Medicare should not have been billed for, or reimbursed, the 99214 CPT code for an office visit.

233. **Illegitimate Cookeville and Harriman Claims in Periods Without Required Supervision for Nurse Practitioners and Without Valid Prescriptions**. Patient M was a 35 year old male. Cookeville Pill Mill I billed for and received reimbursement from Medicare for a new patient office visit that Scott had with Patient M on August 14, 2012 with CPT code 99205 and for giving him one trigger point injection with CPT code 20552 and two nerve blocks with CPT codes 64418 and 64445. On the same day, Patient M filled prescriptions written by Scott

45

for Oxycodone HCL and Morphine Sulfate ER, Schedule II controlled substances, that Medicare paid for. As Anderson knew, Medicare should not have been billed for, or reimbursed, the Part B office visit, injection and nerve block claims, since the nurse practitioner did not perform those services while working in collaboration with a physician under Tennessee law. As Anderson knew, Medicare Part D Plan Sponsors also should not have been billed for, or reimbursed, the Part D claims, since they lacked a valid prescription under Tennessee law.

234. Patient N was a 47 year old male. Harriman Pain Clinic I billed for an established patient office visit with Patient N on January 30, 2012 with CPT code 99213, and for four nerve blocks with CPT codes 64413, 64418, 64421, 64445. The same day, Patient N filled three prescriptions for (a) Endocet, which is Oxycodone with Acetaminophen, a Schedule II controlled substance, (b) Amitriptyline HCL and (c) Cyclobenzaprine HCL, a muscle relaxant, written by the Harriman Pain Clinic's then nurse practitioner, Elizabeth Cox. As Anderson knew, Medicare should not have been billed for, or reimbursed, the Part B office visit and four nerve block claims or the medications, since the nurse practitioner did not perform those services while working in collaboration with a physician under Tennessee law. As Anderson knew, Medicare Part D Plan Sponsors also should not have been billed for, or reimbursed, the Part D claims, since they lacked a valid prescription under Tennessee law.

**Count I:  False or Fraudulent Claims to Medicare**

(31 U.S.C. § 3729(a)(1)(A))
(previously 31 U.S.C. § 3729(a)(1) (1986))
(All Defendants)

235. The United States repeats and realleges paragraphs 1 through 234 above.

236. Defendants knowingly, or with reckless disregard, presented, or caused to be presented false or fraudulent claims for payment or approval, in violation of the False Claims

Act, 31 U.S.C. § 3729(a)(1)(A), specifically, (a) Defendants caused pharmacies to submit requests for payment to Part D Plan Sponsors for medications, including controlled substances, that were not dispensed for a legitimate medical purpose under the CSA, and/or that were dispensed without obtaining a valid prescription under Tennessee law, and (b) Medicare Part B claims coded with CPT code 99214 and modifier -25, when those claims were not payable as such, and/or Part B claims that were provided by a nurse practitioner who was not supervised by a physician as required by Tennessee law.

237.    Because of the Defendants' acts, the United States suffered damages in an amount to be determined at trial, and therefore is entitled to treble damages under the False Claims Act, plus civil penalties of not less than $5,500 and up to $11,000 for each violation.

## Count II:  False Statements to Medicare

(31 U.S.C. § 3729(a)(1)(B))
(previously 31 U.S.C. § 3729(a)(2) (1986))
(All Defendants)

238.    The United States repeats and realleges paragraphs 1 through 237 above.

239.    Defendants knowingly made, used, or caused to be made or used a false record or statement material to a false or fraudulent claim, in violation of the False Claims Act, 31 U.S.C. § 3729(a)(1)(B), including (a) Defendants caused pharmacies to submit false information to Part D Plan Sponsors for medications, including controlled substances, that were not dispensed for a legitimate medical purpose under the CSA and/or that were dispensed without obtaining a valid prescription under Tennessee law, (b) causing Part D Plan Sponsors to submit false certifications that were material to the payment of claims, and (c) upcoding, or causing the upcoding, of claims for Medicare Part B services.

240.    Because of the Defendants' acts, the United States suffered damages in an amount

to be determined at trial, and therefore is entitled to treble damages under the False Claims Act, plus civil penalties of not less than $5,500 and up to $11,000 for each violation.

## Count III:  Payment by Mistake of Fact

### (All Defendants)

241.    The United States and Tennessee repeat and reallege paragraphs 1 through 240 above.

242.    Defendants submitted (or caused the submission of) (a) pharmacies' requests for payment to Part D Plan Sponsors for medications, including controlled substances, that were not dispensed for a legitimate medical purpose under the CSA and/or that lacked a valid prescription under Tennessee law as required by Medicare and the CSA, (b) pharmacies' requests for payment to TennCare for medications, including controlled substances, that were not medically necessary, and (c) Medicare Part B claims coded with CPT code 99214 and modifier -25, when those claims were not payable as such, and/or Part B claims that were provided by a nurse practitioner who was not supervised by a physician as required by Tennessee law, and such claims represent misrepresentations of material facts in that Defendants misrepresented that the medications and services were reimbursable as billed.

243.    The United States and Tennessee paid more money to pharmacies and to Defendants than they would have based on the erroneous belief that Defendants were entitled to reimbursement and without knowing that Defendants submitted, or caused to be submitted, pharmacies' requests for payment to Part D Plan Sponsors and to TennCare for medications that were not covered and for Medicare Part B services that were either not covered or payable only at a lower level of reimbursement.

244.    The United States and Tennessee, acting in reasonable reliance that the

Defendants' claims and/or the related PDE data or pharmacies' TennCare claims were accurate, complete, and truthful, paid Defendants and/or Part D Plan Sponsors and pharmacies participating in TennCare, certain sums of money to which they were not entitled, and Defendants are thus liable to account and pay to the United States and Tennessee such amounts, which are to be determined at trial.

### Count IV:  Unjust Enrichment

### (All Defendants)

245.     The United States and Tennessee repeat and reallege paragraphs 1 through 244 above.

246.     During the time period between January 1, 2011 and July 31, 2014, the United States claims the recovery of all Medicare monies by which Defendants have been unjustly enriched, including profits earned by Defendants from office visits and related services because of Defendants' prescribing medications, including controlled substances, that were not dispensed for a legitimate medical purpose under the CSA, and/or were dispensed without valid prescriptions under Tennessee law, and billing for non-reimbursable Part B services and/or Part B services that were only reimbursable at a lower level.

247.     By retaining monies received from office visits and related services that Defendants received for dispensing Schedule II controlled substances and other medications without valid prescriptions under Tennessee law and for Part B services that were not reimbursable or reimbursable only at lower levels, Defendants retained money that was the property of Medicare and to which they were not entitled.

248.     During the time period between January 1, 2011 and July 31, 2014, the United States and Tennessee claim the recovery of all TennCare monies by which Defendants have been

unjustly enriched, including profits earned from office visits and related services that Defendants earned by prescribing medications without valid prescriptions.

249.    By retaining monies received from office visits and related services for dispensing Schedule II controlled substances and other medications without valid prescriptions under Tennessee law, Defendants retained money that was the property of TennCare and to which they were not entitled.

250.    As a consequence of the acts set forth above, Defendants were unjustly enriched at the expense of the United States and Tennessee in an amount to be determined and which, under the circumstances, in equity and good conscience, should be returned to the United States and Tennessee.

### Count V:  Controlled Substances Act

(21 U.S.C. § 842)
(All Defendants as to Civil Penalties;
Defendants Florence and Scott as to Injunctive Relief)

251.    The United States repeats and realleges paragraphs 1 through 250 above.

252.    Defendants caused pharmacies to fail to comply with the requirements of the CSA by dispensing Schedule II through V controlled substances without a valid prescription that was (a) issued for a legitimate medical purpose and/or (b) complied with Tenn. Code Ann. § 63-7-123, in violation of 21 U.S.C. §§ 829, 842(a)(1) and 21 C.F.R. § 1306.04.

253.    Each of the above dispensations is in violation of 21 U.S.C. § 842(a)(1), and the Defendants are subject to a civil penalty of not more than $25,000 for each violation and the Attorney General may obtain declaratory or injunctive relief relating to the violations.  21 U.S.C. §§ 842(c)(1)(A), 843(f).

## Count VI:  False or Fraudulent Claims to TennCare

(Tennessee Medicaid False Claims Act, Tenn. Code Ann. § 71-5-182(a)(1)(A))
(Defendants Anderson, Scott, Cookeville Center for Pain Management, P.C., Preferred Pain
Center of Grundy County, McMinnville Pain Relief Center, P.C., and PMC Management, LLC)

254.    Tennessee repeats and realleges paragraphs 1 through 253 above.

255.    Beginning in April 2012 through January 2014, Defendants Anderson, Scott, Cookeville Center for Pain Management, P.C., Preferred Pain Center of Grundy County, McMinnville Pain Relief Center, P.C., and PMC Management, LLC, knowingly presented, or with reckless disregard presented, or caused to be presented, false or fraudulent claims for payment or approval under the TennCare/Medicaid program, in violation of the Tennessee Medicaid False Claims Act, Tenn. Code Ann. § 71-5-182(a)(1)(A), specifically, the above Defendants caused pharmacies to submit requests for payment to TennCare for controlled substances that were not medically necessary, were not issued for a legitimate medical purpose under the CSA, and/or that were dispensed without obtaining a valid prescription under Tennessee law.

256.    As a result of the false or fraudulent claims that these Defendants presented, or caused to be presented by pharmacies, the State has suffered damages and is entitled to and requests treble damages under the Tennessee Medicaid False Claims Act, in an amount to be determined at trial, plus a civil penalty of $5,000 to $25,000 for each violation.

### Prayer for Relief

Wherefore, the United States and Tennessee demand and pray that judgment be entered in their favor and against Defendants jointly and severally as follows:

1)      On the First and Second Counts against Defendants, under the False Claims Act, for the amount of the United States' damages, trebled as required by law, and such penalties as

are required by law, together with all such further relief as may be just and proper.

2)     On the Third Count for payment by mistake, against Defendants for the amounts they obtained from Medicare and TennCare/Medicaid to which they were not entitled, plus interest, costs, and expenses.

3)     On the Fourth Count for unjust enrichment against Defendants, for the damages sustained and/or amounts by which Defendants were unjustly enriched or amounts by which Defendants retained monies received from reimbursements paid by the United States and Tennessee to which they were not entitled, plus interest, costs, and expenses.

4)     On the Fifth Count for violations of the Controlled Substances Act, for civil penalties against all Defendants and for injunctive and declaratory relief against Defendants Florence and Scott.

5)     On the Sixth Count under the Tennessee Medicaid False Claims Act against Defendants for the amount of Tennessee's damages, trebled as required by law, such civil penalties as are required by law, together with costs of this action and such further relief as may be just and proper.

6)     All other relief as may be required or authorized by law in the interests of justice.

Respectfully submitted,


For the United States:                    DAVID RIVERA
                                          United States Attorney
                                          Middle District of Tennessee

                               By:     s/Ellen Bowden McIntyre
                                       ELLEN BOWDEN MCINTYRE (BPR #023133)
                                       Assistant United States Attorney
                                       United States Attorney's Office
                                       110 Ninth Avenue South, Suite A-961
                                       Nashville, TN 37203
                                       Phone: (615) 736-5151
                                       Fax: (615) 401-6626

52

Ellen.Bowden@usdoj.gov

For the State of Tennessee:

 s/Herbert H. Slatery III
HERBERT H. SLATERY III
Attorney General & Reporter
PHILIP H. BANGLE, BPR 031636
Assistant Attorney General
Medicaid Fraud & Integrity Division
Tennessee Attorney General's Office
425 Fifth Avenue North
Nashville, TN 37243
Telephone: 615-741-6421
Fax: 615-532-4892
Philip.Bangle@ag.tn.gov

## <u>CERTIFICATE OF SERVICE</u>

I certify that a true and correct copy of the foregoing is being served, by use of the Court's electronic case management system, on July 22, 2016, to the following:

| | |
|---|---|
| Robert A. Peal<br>Neal & Harwell<br>150 Fourth Avenue North<br>Suite 2000<br>Nashville, TN 37219<br>Email: rpeal@nealharwell.com | C. Gene Shiles, Jr.<br>Spears Moore Rebman Williams<br>P.O. Box 1749<br>Chattanooga, TN 37401<br>Email: ces@smrw.com |
| J. Alex Little<br>Bone McAllister Norton, PLLC<br>511 Union Street, Suite 1600<br>Nashville, TN 37219<br>Email: alex.little@bonelaw.com | Jason R. Edgecombe<br>Baker Donelson<br>Monarch Plaza, Suite 1600<br>3414 Peachtree Road<br>Atlanta, GA 30326<br>Email: jedgecombe@bakerdonelson.com |
| Joy Boyd Longnecker<br>Baker Donelson<br>Baker Donelson Center<br>211 Commere St., Suite 800<br>Nashville, TN 37201<br>Email: jlongnecker@bakerdonelson.com | Dr. Council Rudolph<br>15 Veteran's Drive<br>Decherd, TN 37324 |

s/Ellen Bowden McIntyre
ELLEN BOWDEN MCINTYRE
Assistant United States Attorney